**Alvin Urial GOODWIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69889.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 24, 1990.

Rehearing Overruled Nov. 28, 1990.

John D. MacDonald, II, New Caney, for appellant.

Peter C. Speers, III, Dist. Atty., and Thomas D. Glenn, Asst. Dist. Atty., Conroe, Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. TEX.PENAL CODE ANN. § 19.03(a)(2). After finding the appellant guilty, the jury returned affirmative findings to the special issues under Article 37.071, TEX.CODE CRIM.PROC. ANN. Punishment was assessed at death.

Appellant raises thirteen points of error. He challenges: the trial court's denial of appellant's pre-trial motion to suppress his warrantless arrest and search on December 4, 1986; the trial court's denial of his pretrial motion to suppress his confessions, arguing that the confessions were "fruit[s] of the poisonous tree" resulting from evidence obtained during his warrantless arrest and search; the trial court's denial of his pre-trial motion to suppress his confessions, arguing that the confessions were made without effective waiver of his right to counsel; the exclusion of three venirepersons who were excused for cause based on their bias against the imposition of the death penalty; the exclusion of one venireperson who was excused for cause based on her inability to read and write; the exclusion of one venireperson who was excused for cause based on grounds that her

physical condition made her unfit for jury service; the retroactive granting of the State's challenge for cause of one venireperson after appellant and the State had accepted the venireperson; the admission at trial of autopsy photographs of the victim; the trial court's denial of appellant's specially requested instruction—that his confessions, standing alone, were not sufficient to convict for the alleged offense; the trial court's denial of appellant's specially requested charge on the lesser included offense of murder; and finally, the sufficiency of the evidence to sustain his conviction under TEX.PENAL CODE ANN. § 19.03(a)(2), arguing that the evidence was insufficient to show that the murder was committed during the course of a robbery or kidnapping. We will affirm.

On December 1, 1986, Montgomery County Sheriff's deputies received a report of a theft at the trailer house of James Douglas Tillerson. Further investigation revealed that Tillerson's trailer house had been ransacked and that a VCR, some homemade video cassettes, phonograph records and a bayonet were missing from the house. Tillerson had not reported for work that morning and had not been seen since the previous Sunday.

On January 17, 1987, Tillerson's body was discovered by trailriders approximately two and one-half miles from his trailer at the edge of the woods near Fawnmist Road in Montgomery County. At the scene, Officers Peterson, Self and Oldham inspected the body's clothing and tentatively identified the body as Tillerson. Harris County Assistant Medical Examiner, Dr. Vladimir Parungoa, positively identified the body as Tillerson. Dr. Parungoa's examination disclosed that Tillerson had been dead for approximately one month and had died from a gun-shot wound to the head. A second gun-shot wound had been made by a projectile entering Tillerson's right arm, exiting at the forearm. Parungoa recovered a bullet from the body's clothing and gave it to Montgomery County officers present at the autopsy. Using a metal detector, Officers Self and Oldham later recovered fragments of a projectile in the immediate area where Tillerson's body had been discovered.

On the afternoon of January 17, 1986, Self contacted Susan Rung and Kevin Smith, friends of Tillerson, who resided near Tillerson's trailer house. Rung told Self that Tina Atkins, also a friend of the victim, had told her that a VCR, bayonet and several video tapes from Tillerson's trailer were now at the house where she was living with her father, Billy Dan Atkins Sr. Rung was able to name the titles of the video tapes, which corresponded with the titles of the tapes missing from Tillerson's trailer.

Based on the information provided by Tina Atkins, a search warrant was issued for the residence of Billy Dan Atkins Sr., and executed on January 18, 1987. Several items were seized by detectives including: two video tapes; a box labeled "Budweiser"; several phonograph records; and a bayonet which was found in the trunk of a 1973 Ford Torino parked at the house. Atkins Sr. had found the other items in Atkins Jr.'s Torino. Atkins Jr. had given his father the keys and title, and Atkins Sr. had retrieved the Torino from a wrecker yard where it had been impounded since December 28, 1986. The video tapes, "Budweiser" box, and the bayonet were identified by Tillerson's family as items missing from his trailer since December 1, 1986.

A capital murder warrant for Billy Dan Atkins Jr. was issued on January 19, 1987. Further investigation revealed that Atkins, appellant, Glenn Dierr and Fred Meadows had been arrested for unlawful possession of firearm by felon on December 4, 1986 in The Woodlands, Texas.

Self interviewed Dierr, who stated that he had been walking in the woods near Huntsville, Texas with appellant on December 5, when appellant showed him a fence post. Appellant claimed to have fired several rounds from a .357 Magnum into the fence post, and further stated that he had "blown someone away" with the weapon five weeks earlier and that the body was still in the woods. Dierr directed officers to the area of the fence post. Officers

recovered three bullets and some spent hulls from the ground.

Detectives later discovered that the weapons seized from Atkin's car on December 4 were still in the Sheriff's property room. They retrieved a Smith and Wesson .357 Magnum and a Thompson Contender .357 Magnum from the property room. Detectives sent these weapons, the bullet recovered from Tillerson's clothing, the fragments found on the ground near Tillerson's body, and the bullets and hulls found in and around the fence post to Houston firearms expert C.E. Anderson. After ballistics testing, Anderson determined that all of the projectiles and hulls had been fired from the Smith and Wesson .357 Magnum.

On January 20, 1987, Officer Peterson was notified that appellant and Atkins had been arrested and were in custody in Burlington, Iowa. Peterson and Oldham travelled to Burlington and interviewed appellant on January 21. When told by Oldham that they had found the weapon used to kill Tillerson, and that it was the same weapon taken from Atkin's car on December 4, appellant admitted to having shot Tillerson. After obtaining a full videotaped confession, Peterson and Oldham requested a warrant for appellant's arrest, which was issued in Montgomery County and teletyped to Iowa. Appellant waived extradition and was taken to Montgomery County that evening. The next morning appellant was interviewed by officers in Montgomery County and later gave a written confession.

According to appellant, on the night of the murder, between eight and ten p.m., he and Atkins drove by Tillerson's trailer. Atkins and appellant had discussed the possibility of either obtaining a loan from Tillerson or robbing him. When Tillerson answered the door at his trailer home, Atkins and appellant entered and pulled out their weapons. Atkins ordered Tillerson to sit down in a chair and demanded money. Tillerson claimed that he had no money, but Atkins began to ransack the trailer. Unable to find more than some change, Atkins began to collect other items from the trailer. Atkins then ordered Tillerson to get dressed and appellant held a weapon on Tillerson while Atkins loaded the items into his car. Atkins then ordered Tillerson into his car. While Atkins and Tillerson were getting into the car, appellant went through the trailer turning off the lights and locking the door.

Atkins, appellant and Tillerson left in Atkins' car, with Atkins driving, Tillerson in the back seat, and appellant in the front seat, pointing his .357 Magnum at Tillerson. Atkins was unable to find a particular road he was looking for and eventually stopped near a wooded area where he ordered Tillerson to get out of the car and ordered him to walk ahead of Atkins and appellant into the woods. Appellant and Atkins walked behind Tillerson until the woods became too thick to walk further. Atkins raised a handgun, aimed at Tillerson and pulled the trigger two or three times, but the weapon did not discharge. Appellant raised his .357 Magnum, turned his head, and fired at Tillerson. Tillerson fell to the ground screaming. Thinking that he had only grazed the victim, appellant quickly raised his weapon and fired a second shot. Appellant saw blood coming out of Tillerson's head and ran back to Atkins' car.

In his first point of error, appellant alleges the trial court erred when it denied his pre-trial motion to suppress evidence obtained from his warrantless arrest and search on December 4, 1986. Appellant argues that he was arrested without warrant and without probable cause following a stop and search of a vehicle (Atkins' Ford Torino) in which he was a passenger. He claims ownership of luggage which was searched, and wherein a Smith and Wesson .357 Magnum and other items were found and seized. He further argues that the stop of the vehicle was merely a pretext stop to enable law enforcement officers to search the vehicle without warrant and probable cause, all in violation of the Texas and Federal Constitutions [1] and Arti-

---

1. In his brief before this Court, appellant cites Article I, § 9 of the Texas Constitution. However, because appellant provides no argument or authority as to the protection provided by the

cles 1.04, 1.06 and 38.23, TEX.CODE CRIM.PROC.ANN.

The facts surrounding the search and seizure of items from Atkins' Torino follow. Officer Daniel Torres of The Woodlands Division, Montgomery County Sheriff's Department was patrolling at 7:30 p.m. when he spotted Atkins' 1973 Ford Torino at the corner of Riverbank and Redberry. Torres' attention was first called to the vehicle because of its extensive body damage. Torres also noted that he had never before seen the car in the neighborhood, an area where there had been several burglaries, and that the car had four male occupants. Torres watched through his field binoculars as the Torino pulled into the driveway of a vacant house. The Torino parked in the driveway of the vacant house and all four men remained in the car. A few minutes later the driver backed the Torino out of the driveway and proceeded through the neighborhood. Torres continued following the Torino until the driver made a right turn and failed to use his turn signal.

Torres was suspicious of the activities of the Torino and its occupants. The driver was driving around in circles in an area of mostly dead-end streets. Torres surmised that the occupants of the Torino were either looking for a place to burglarize or were involved in drug activity or were merely lost.

After stopping the Torino, Torres observed one of the back seat passengers bend over and then come back up into view. He became concerned for his safety when the driver quickly got out of the car, adjusted the waistband of his trousers, and approached Torres' patrol car "unusually fast." Torres also noted that the passengers kept their eyes on him.

The driver (Atkins) produced his driver's license and Torres informed Atkins that he was being stopped for failure to signal a turn. Atkins told Torres that he and his passengers were looking for the Conroe bus station. Torres decided to call for a back-up unit since he did not want to approach a car with four male occupants. After calling for back-up, Torres approached the car anyway and asked the passengers for identification. At this point he had not decided to issue a ticket to the driver, but decided to identify the passengers because he was suspicious of everyone and this procedure was in accord with Sheriff's department policy. Torres used a flashlight to check the inside of the car, but did not see any weapons and returned to his patrol car to call back the dispatcher with the identification information.

Deputy Sheriff Kevin Pullen arrived at the scene in answer to Torres' call for a back-up unit. Pullen saw Torres standing beside the Torino and then begin to walk back to his patrol car. Pullen shined his spotlight on the Torino. He noted that the passengers were staring at him and continued to do so as he walked to Torres' patrol car.

Torres informed Pullen that he had seen the rear driver's seat passenger make a downward movement with the upper portion of his body. At that point Pullen and Deputy Sheriff Michael Todd Harris, who had just arrived in response to Torres' call, approached the Torino. Pullen was on the passenger side of the car when he shouted for the two back seat passengers to get out of the car. The front and rear passenger doors opened at the same time. Pullen kicked the front door closed and ordered the front seat passenger (appellant) to remain in the car until the rear seat passengers (Dierr and Meadows) were out of the car.

As appellant opened the front passenger door, Harris, using his flashlight, noticed a large hunting knife on the car's front passenger side between the seat and the door. As Harris removed the knife from the car he noticed two "gym type" bags on the floor. He placed the knife on top of the car and looked at the bags. Harris noticed what appeared to be the butt or hand-grip of a hand gun sticking out the partially

Texas Constitution, we consider the point inadequately briefed and will not address it. *See* TEX.R.APP.P. 74(f) and 203; *McCambridge v.*

*State,* 712 S.W.2d 499, 501–502 fn. 9 (Tex.Cr. App.1986).

unzipped opening of a black canvas bag. Harris unzipped the bag to confirm that there was a hand gun in the bag. He then announced to the other officers that "they (passengers) had firearms in their possession." The fully loaded hand gun in the bag was later determined to be the Smith and Wesson .357 Magnum used to kill Tillerson.

Appellant, Atkins, Dierr and Meadows were taken into custody and transported to the station where they were all charged with "possession of a firearm by felon." Atkins was also cited for failure to change address on his driver's license and for failure to signal a turn.

As a threshold issue, appellant asserts that he has standing to challenge the warrantless search of Atkins' car. The trial court made no specific findings regarding his standing to challenge the search of the Torino and the State did not argue the point in their brief. We will assume that the trial court made an implied finding that appellant possessed standing to contest the search, and since the State has now failed to contest standing on appeal, we will presume appellant has standing.[2]

Turning to the substance of appellant's first point of error, appellant asserts that evidence elicited at the pre-trial hearing was insufficient to support the trial court's findings that: the search was incident to lawful arrest; and that the officer had specific articulable facts to detain the car and its occupants. The essence of appellant's claim is that Torres' stop of Atkins' car and subsequent detention of its passengers was a pretext arrest, in that the officer used a minor traffic violation as a pretext to conduct what might otherwise be an impermissible search.

Appellant relies primarily on *Amador-Gonzalez v. United States*, 391 F.2d 308 (5th Cir.1968) and its related line of cases. The pretextual stop doctrine is implicated when police discover evidence in a search incident to an arrest for an offense which the officer would have ignored except for his desire to search for evidence of other offenses. *United States v. Johnson*, 815 F.2d 309 (5th Cir.1987). The Fifth Circuit Court, however, expressly overruled *Amador-Gonzalez* in *United States v. Causey*, 834 F.2d 1179 (5th Cir.1987).

In *Causey*, the defendant was tentatively identified as the robber of a bank, but police believed that they lacked probable cause to arrest and interrogate him about the bank robbery. Searching their records, police found an unrelated outstanding valid warrant for Causey's arrest. Police arrested Causey, gave him *Miranda* warnings, questioned him about the bank robbery, and obtained a confession. *Id.* at 1180. A panel of the Fifth Circuit Court found that police motives in arresting a defendant are irrelevant as long the police are not engaging in unlawful conduct.

> [S]o long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry.... The correct rule is that ... in a case where the officers have taken no action except what the law objectively allows, their subjective motives in doing so are not even relevant to the suppression inquiry. And the reason lies in the purpose of that rule: to deter *unlawful* actions by police. Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which they acted is of

---

2. Assuming arguendo that standing was at issue in this case, the facts as developed show that appellant had standing to contest the search. Appellant claimed no ownership interest in Atkins' Torino. In his motion to suppress evidence, however, appellant specifically laid claim to ownership of "certain luggage" seized from Atkins' Torino. The Supreme Court's decision in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) adopting the "expectation of privacy" test "does not conflict with the notion that, at least in some circumstances, a person may have standing by virtue of the fact that *his* personal property is in the car." 4 LaFave, Search and Seizure § 11.3(e) 339 (2d ed.1987). Given appellant's asserted ownership interest in the luggage that was searched and seized, and that the luggage was found at his feet, the appellant demonstrated a significant expectation of privacy sufficient to sustain his claim of standing to challenge the search which resulted in the discovery of the weapon used to kill the victim.

no consequence. (emphasis original, footnotes omitted)

*Id.* at 1184–1185.

This Court has followed *Amador–Gonzalez* in excluding evidence obtained through pretext arrests. *Black v. State*, 739 S.W.2d 240 (Tex.Cr.App.1987). The pretext arrest doctrine, however, has been used only to exclude evidence where the record clearly supports a finding that the police officers involved knew that the defendant was suspected of other specific crimes and arrested the defendant to further their investigation with respect to those crimes.

In *Black*, for example, the defendant was a suspect in a murder investigation. Police lacked probable cause for an arrest and set up a stake-out. After observing numerous traffic violations, the police stopped the car Black was driving, but then arrested Black for "suspicion of murder." After extensive searching of the car and his apartment and polygraph testing, Black confessed to shooting the victim. At the pre-trial hearing, the arresting officers admitted that the reason Black had been arrested was to question him about the murder. The Court found this to be squarely within the pretext arrest doctrine of *Amador–Gonzalez* and excluded Black's confession. *Id.* at 242–245.

In the instant case, the arresting officers testified at the appellant's pre-trial hearing. Specifically, Deputy Torres, the officer who made the decision to stop Atkins' car, testified as follows:

"Q. [By Ms. Turner, prosecutor] So after it (Atkins' car) approached the intersection of Bitterwood and Tanglebrush or the drive here, what did you observe if anything?

"A. The vehicle made a right hand turn again and proceeded down Tanglebrush and came to the stop sign located at Glenloch and Tanglebrush. At this point they made another right hand turn and failed to turn their turn signal on.

\* \* \* \* \* \*

"Q. At the time you stopped the vehicle, why did you stop it?

"A. For the failure to turn the signal on.

\* \* \* \* \* \*

"Q. [By Mr. Crow, appellant's attorney] Do you perceive in your mind that you really need to check these people out down there in The Woodlands?

"A. Possibly, u-huh.

"Q. So really at that point you start looking for a reason to stop them so you can check them out.

"A. No, I stopped them because they made a violation of the law, cut and dry."

■ At no point in his testimony did Torres indicate that he stopped Atkins' car for any reason other than a clear, if minor, traffic violation. Torres testified that he was suspicious of the activities of the car and its occupants, but the record is clear that he made no attempt to stop the car until he observed a traffic violation. Torres acted lawfully in stopping Atkins' car for failure to signal. Torres' generalized suspicion of possible illegal activity by the appellant did not invalidate a legal stop for a traffic violation. In addition, there was no indication that Torres had any knowledge that Atkins, appellant or the other passengers were suspected of any other crimes or that the car contained evidence of any other crimes. Torres testified that he had never seen the car before and that he did not know any of the occupants of the car. Thus, the facts as developed in regard to appellant's stop and arrest can not be construed as constituting a pretext arrest, therefore, we need not at this time address the conflict between *Black v. State* and *U.S. v. Causey*.

■ Appellant also asserts that the initial stop of Atkins' car was an unlawful detention. Circumstances short of probable cause for arrest may justify a brief detention for investigative purposes. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968); *Ebarb v. State*, 598 S.W.2d 842 (Tex.Cr.App.1980). "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the

officer at the time." *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Terry*, supra, 392 U.S. at 21–22, 88 S.Ct. at 1879–80. "In order to justify the intrusion, the law enforcement officer must have specific, articulable facts, which in the light of his experience and general knowledge, together with other inferences from those facts, would reasonably warrant the intrusion on the freedom of the citizen detained for further investigation." *Dickey v. State*, 716 S.W.2d 499, 504 n. 4 (Tex.Cr.App.1986) (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 880–81, 95 S.Ct. 2574, 2579–80, 45 L.Ed.2d 607 (1975)).

Torres' initial stop of Atkins' car was a lawful stop for a traffic offense. His observations of suspicious activity by the occupants of the car before and after the stop, combined with his knowledge of the area and the frequency of burglaries in the neighborhood, and the reasonable inferences to be drawn from the appellant's and his companions' behavior, justified a brief detention of the occupants of the car for further investigation.

■ Once the valid traffic stop was made, officers at the scene were entitled to take sufficient measures to guarantee their safety. Police officers are allowed to order drivers out of their cars once they have been lawfully stopped for a traffic offense. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). An officer is allowed to establish a "face-to-face confrontation" which "diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault." The safety of the officer is a "legitimate and weighty" justification for allowing "this additional intrusion [which] can only be described as *de minimis*." *Id.* at 110–11, 98 S.Ct. at 333. The Supreme Court has also recognized the need for protecting police officers when conducting investigative detentions.

When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Terry*, supra, 392 U.S. at 24, 88 S.Ct. at 1881.

In *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) the Supreme Court held that when an arrest is made, it is reasonable for the arresting officer to search "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763, 89 S.Ct. at 2040 (citing *Terry v. Ohio*, supra). The Court extended the *Chimel* definition of "the area within the immediate control of the arrestee" to include the interior of a passenger car in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). "[A]rticles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon' ..." The Court also found that "the police may examine the contents of any open or closed container found within the passenger compartment." *Id.* at 460, 101 S.Ct. at 2864.

The Supreme Court later relied on *Terry* and its related line of cases in finding that a roadside search of a detainee's automobile is justified when the officer reasonably believes that the suspect poses a danger.

Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in

which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. See *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*, at 27, 88 S.Ct. at 1883. If a suspect is "dangerous," he is no less dangerous simply because he is not arrested. (footnotes omitted)

*Michigan v. Long*, 463 U.S. 1032 at 1050–51, 103 S.Ct. 3469 at 3480–81, 77 L.Ed.2d 1201 (1983). While *Long* does not stand for the proposition that the police may conduct automobile searches whenever they make an investigative stop, an officer may conduct a protective search of a detainee's automobile when the officer has a reasonable belief, based on specific and articulable facts, that the detainee may pose a danger to the officer or to others.

■ After stopping Atkins's car, Torres observed one of the back seat passengers make a downward movement with the upper portion of his body. Atkins exited the car, adjusted his waistband and quickly approached Torres' patrol car. The occupants of the car "kept their eyes" on Torres. Torres could reasonably believe that the passengers posed a threat to his safety, even after approaching the car by himself to identify the passengers. Once appellant opened the front passenger door of Atkins' car, Harris could see, in plain view, what appeared to be an illegal knife. At that point, the officers could reasonably believe, based on their observations, that the suspects might be in possession of additional weapons. In addition, once Harris found an illegal knife, appellant was subject to arrest; thus a continued and more extensive search of the passenger compartment and containers located within the car was justified. Appellant's point of error number one is overruled.

In his second point of error, appellant alleges that the trial court erred in denying his motion to suppress his oral and written confessions, arguing that the statements were "fruit[s] of the poisonous tree" and were excludable under the exclusionary rule of the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 485 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

Appellant and Atkins were arrested and held in custody in Burlington, Iowa, when Officers Peterson and Oldham arrived with a capital murder warrant for the arrest of Atkins. Peterson and Oldham decided that they would also interview appellant regarding Tillerson's murder since he had been in Atkins' company in December and was arrested with Atkins on December 4, 1986. Peterson and Oldham interviewed appellant on January 21, 1987. After reading appellant his rights, Oldham informed him that they were investigating Tillerson's murder and that they had recovered the murder weapon from Atkins' car in the December search and that they were trying to obtain a capital murder warrant for his arrest. In response, appellant stated "I'm twenty three years old, sitting on death row." When Oldham replied that was not necessarily true, appellant replied that he knew he was going to get the death penalty because he had pulled the trigger. The officers stopped the· interview and explained to appellant that they wanted a full video-taped confession. After appellant had read and signed a rights waiver, appellant cooperated in giving a video-taped confession. Appellant waived extradition and was returned to Montgomery County that evening. The next morning, appellant was given warnings by a Montgomery County magistrate, executed a second waiver and gave a written statement.

The trial court found that appellant's statements were not "fruits of the poisonous tree" and that knowledge and possession of the evidence was obtained from a source independent of the seizure of the weapon on December 4, 1986.

■ The State asserts that since the initial investigatory stop of Atkins' car, and

the resulting search of the car and the arrest of appellant were lawful, appellant's confessions could not be "fruit[s] of the poisonous tree." As we have already determined that appellant's warrantless arrest and search on December 4 was lawful, any evidence obtained as a result of that search was lawfully obtained. There is no evidence to show that Peterson, Oldham or other officers confronted appellant with any other unlawfully obtained evidence. Since there is no "poisonous tree", there is no "poisoned fruit." The trial court properly denied appellant's motion to suppress his confessions. Appellant's point of error number two is overruled.

In his third point of error, appellant asserts that his motion to suppress his confessions was improperly denied, arguing that his statements to police officers were made without effective waiver of assistance of counsel. In arguing that the evidence was insufficient to support the trial court's finding, appellant's brief only discusses in detail Article 1 § 10, Texas Constitution and the Fifth Amendment, United States Constitution. We will therefore limit our analysis to these two provisions.

The facts relevant to the appellant's third point of error reveal that Iowa attorney Allen Winnels arrived at the Des Moines County jail shortly after Peterson and Oldham began to videotape appellant's confession. It appears that Winnels had been appointed to represent appellant with respect to several outstanding charges in Iowa.[3] Winnels identified himself as appellant's attorney and stated that he wanted to visit with appellant. He was informed by the Burlington and Des Moines County officers on the scene that appellant was being interviewed by Texas officers in regard to some "Texas incidents." Winnels did not request an immediate audience with appellant and left shortly thereafter. Winnels did later advise appellant regarding his waiver of extradition.

In asserting his Texas constitutional claim, appellant relies primarily on *Dunn v. State,* 696 S.W.2d 561 (Tex.Cr.App.1986). Since this Court in *Dunn* found a violation of both the Texas and Federal Constitutions, the holding does not represent an independent and adequate state ground under *Michigan v. Long,* supra, 463 U.S. at 1041, 103 S.Ct. at 3476. Thus, the holding in *Dunn* is not insulated from review by the Supreme Court. Moreover, the holding in *Dunn* has been implicitly overruled by the Supreme Court in *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Thus, we will consider appellant's arguments in light of the decision in *Moran v. Burbine.*

The State asserts that appellant's waiver of counsel was effective by authority of *Moran v. Burbine.* In *Moran v. Burbine,* the police misinformed an inquiring attorney about their plans concerning the suspect they were holding and failed to inform the suspect of the attorney's efforts to reach him. *Id.* at 420, 106 S.Ct. at 1140. The court stated that "such [police] conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 424, 106 S.Ct. at 1142. Thus, if a suspect makes a voluntary decision to waive his

---

3. The facts surrounding Winnel's appointment in Iowa as appellant's attorney are unclear. Appellant does not assert in his brief that his Sixth Amendment right to counsel had attached prior to his interrogation by Officers Peterson and Oldham. In addition, the record does not support a finding that appellant had been arraigned for the charges pending against him in Iowa. The record does show that appellant was presented to a magistrate in Montgomery County and charged with capital murder. Appellant did not assert his right to counsel at that time. Appellant gave a written confession approximately twenty-five minutes later. It is uncontroverted in the record, however, that appellant's confession was not the product of police initiated interrogation.

The Sixth Amendment guarantee of assistance of counsel provides for the right to counsel at post-arraignment interrogations. The arraignment signals the initiation of adversarial judicial proceedings. "[I]f police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986); *Nehman v. State,* 721 S.W.2d 319, 321–322 (Tex. Cr.App.1986).

right to counsel, and is fully aware of and comprehends the information conveyed to him in *Miranda* warnings, the waiver will be valid. "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 418, 106 S.Ct. at 1139.

■ Appellant asserts that he was denied counsel by Iowa police, who misled his attorney into thinking that the interview with Texas officers was related to minor "Texas incidents," and that the officers failed to inform him that his appointed counsel was waiting for him at the jail. Under the *Moran v. Burbine* analysis, such conduct is irrelevant to the inquiry into the effectiveness of his waiver, absent a showing that such conduct prevented appellant from attaining awareness and comprehension of the information conveyed in *Miranda* warnings. Appellant made no such showing at his pretrial hearing. We find that appellant's waiver of his right to counsel was voluntary and conclude from the facts and circumstances surrounding the waiver that it was knowingly and intelligently made. The trial court properly denied appellant's motion to suppress his confessions. Appellant's point of error number three is overruled.

In his fourth, fifth and sixth points of error, appellant asserts that the trial court erred in excluding venirepersons Smith, Markowich and Decuir for cause, based on their bias against the death penalty.

During the voir dire examination of Ms. Smith, the prosecutor asked the following:

Q. [By Ms. Turner, prosecutor] ... Now, you don't have to put yourself in the position of taking that oath, if your convictions are such that you cannot take the oath which might cause you to return a verdict which would result in the death penalty, and that is what we are exploring, right now. Could you take that oath, and could you true answers [sic] of, "Yes", render, if we proved to you, beyond a reasonable doubt that those questions [TEX.CODE CRIM.PROC.ANN., art. 37.071] should be answered, "Yes",

and the end result would be the death penalty?

A. I couldn't sit in judgment on anyone else's life.

Q. On any other type case, where we weren't talking about the death penalty, do you feel you could follow the oath, but it's just when the death penalty is involved?

A. Yes.

Q. It's just your attitude about the death penalty?

A. It's my personal feelings, I don't even feel it's an attitude—a very personal, individual feeling that I have. I hold no animosity toward the State, or anyone else, for fulfilling their laws as they are written, but I, personally, and individually, feel that this is wrong, and don't wish to be a part of it.

Q. Would you go so far as to say that you could not, in good conscience, take an oath, saying that you would, maybe, follow the law, where there is a possibility that the death penalty would result?

A. I'm not going to swear to something, and then not do it the way I swore that I would do it. I couldn't take the oath.

Appellant's attorney attempted to rehabilitate Ms. Smith. In trying to determine whether Ms. Smith was unequivocally opposed to the death penalty in all cases, he asked her the following:

Q. [By Mr. Crow, appellant's attorney] My question is, do you believe there should never be the punishment of death, in any criminal case, no matter how heinous?

A. Death is not a punishment.

Q. That still does not answer my question.

A. Well, the only way I know how to answer it is, the laws are made by the will of the people, and I have no quarrel with it. I just don't want to be a part of it.

Q. I understand what you're saying. You don't want to be a part of it, but, as far as your personal convictions are concerned, are you totally and absolutely against the death penalty, no matter how

bad; and, under no circumstances, could you follow the law or anything in that regard that the Court might give you, if you served as a juror in this case, or in any case?

A. I think what I said a while ago, is that I'll not take an oath that I will do something, and then, according to the laws of the State, it be presented to me that this person should be found guilty, and should suffer the highest consequences of the law, and I'm sworn to uphold it.

Q. What you are telling me, is if you took that oath, you could follow it, is that correct?

A. I guess so.

Q. And, if that oath, if you followed that oath, and you considered the facts in a particular case, and it was proved to you, beyond a reasonable doubt, that you should answer a question a certain way, if you took the oath, you could follow it?

A. I guess I could.

The State may challenge for cause any venireperson that "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." TEX.CODE CRIM.PROC. ANN. art. 35.16(b)(3); *Franklin v. State*, 693 S.W.2d 420, 424 (Tex.Cr.App.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). However, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

In reviewing the trial court's decision to sustain a challenge for cause under article 35.16(b)(3), the correct standard for review is "whether the evidence was sufficient to support the trial judge's implied finding of fact." *Hernandez v. State*, 757 S.W.2d 744, 753 (Tex.Cr.App.1988). The venireperson's testimony "must include answers reasonably tending to support a finding, under the correct legal standard, that the juror would be unable to do his job well enough

if selected. Otherwise, the finding will not be supported by the record." *Id.*

■ In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court reaffirmed the *Adams* holding "as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment." The Court realized, however, that "this standard does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id.* at 424, 105 S.Ct. at 852 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

> What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... this is why deference must be paid to the trial judge who sees and hears the juror. (footnotes omitted)

*Id.* 469 U.S. at 424–25, 105 S.Ct. at 852–53; *Briddle v. State*, 742 S.W.2d 379, 384 (Tex. Cr.App.1987), *cert. denied*, 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988). Thus, when faced with the ambiguous voir dire record of a venireperson who indicates both an inability to follow the law because of her views on the death penalty, and an ability to follow her oath and the law as instructed by the court, great deference should be given to the decision of the trial judge. A trial court's ruling on these issues should be reversed "only when the record shows a clear abuse of discretion." *Davis v. State*, 782 S.W.2d 211, 216 (Tex. Cr.App.1989).

■ When a venireperson states that her convictions are so strong that she cannot take an oath, knowing that a death sen-

tence is a possible result at trial, the venireperson is subject to challenge for cause. If the venireperson specifically states that she would be unable to take the oath required of a juror, then that venireperson has made it " 'unmistakably clear' that she could not be trusted to 'abide by existing law' and 'to follow conscientiously the instructions' of the trial judge." *Lockett v. Ohio*, 438 U.S. 586, 596, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978) (quoting *Boulden v. Holman*, 394 U.S. 478, 484, 89 S.Ct. 1138, 1142, 22 L.Ed.2d 433 (1969)); *Ellis v. State*, 726 S.W.2d 39, 44 (Tex.Cr.App.1986), *cert. denied*, 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987) (venireperson excluded for cause after stating unequivocally that he would not take the oath of a juror).

■ Although Smith indicated on cross-examination that if she actually took the oath she guessed that she could follow it, she never wavered from her position that she could not take the oath. Smith's statement that she guessed she could follow the oath if compelled to, taken in the context of her other statements, is not, in itself, a clear affirmation of her willingness or ability to follow the instructions of the court and the law. Where the record supports a finding that the venireperson would be unable to take the oath required of a juror and follow the law as given by the court, the trial court's decision to exclude the venireperson should be given deference. *Wainwright v. Witt,* supra. Smith's testimony, when viewed as a whole, is sufficient to support the trial court's decision to sustain the State's challenge for cause.

■ Appellant also argues that venireperson Decuir was improperly excused for cause. Appellant argues that Decuir stated that she could follow the law, consider the evidence and base her answers to the special issues of article 37.071 on the evidence. At the voir dire examination the prosecutor asked the following:

Q. [By Ms. Turner, prosecutor] ... I believe you circled [on the State's questionnaire] you could never, under any circumstances return a verdict which assessed the death penalty?

A. Right.

Q. Now, I take it that's because you are opposed to the death penalty?

A. Yes, I am.

Q. And, how long have you held that view?

A. Since I was old enough to understand it.

* * * * * *

Q. ... Do you feel that your view, if you were a juror, if you put yourself in the position of taking the oath, do you feel that your view of the death penalty would affect the way you view the evidence?

A. No matter what the evidence would be, my standing would still be the same.

Q. Let's assume that you may be able to find him guilty of capital murder, in answering questions number one and two, we don't really have to go into the details of them at this time, do you feel that because you're so opposed to the death penalty that you would tend to answer those questions in a way where the death penalty would not be the result because of your opposition to the death penalty?

A. Yes.

Q. If you had to take the oath, would your view of the death penalty impair or effect—would you be able to perform your duty as a juror because of your view of the death penalty?

A. Yes.

Q. And, in any circumstance, are you telling us that you would answer those questions in a way where the death penalty could never be the result because of your views of the death penalty?

A. Yes.

* * * * * *

Q. Can you say that because it would be difficult for you to pass judgment on a case involving the death penalty that you just wouldn't take the oath and put yourself in that position.

A. Yes. I would not take the oath to put myself in that position.

Appellant's attorney attempted to rehabilitate Decuir by asking the following:

Q. [By Mr. Crow, appellant's attorney] Can you follow the oath and render a verdict based on the law given by the Court and the evidence in making your decisions in this case?

A. If it came to the point that it was solely my answer that would render the case, the verdict I would have to give, my true answer, no matter what.

Q. You would have to give your true answer no matter what?

A. Yes, sir.

Q. And, your true answer would be how you felt about the evidence and how that decision should be made?

A. Yes, sir.

The State then redirected voir dire of Decuir to elicit the following responses:

Q. [By Ms. Turner] ... wouldn't your view on the death penalty affect the way you viewed the evidence that would cause you to answer questions number one and two?

A. If the evidence is there, it's there and I'll say that it would prove him guilty, yes, but as far as passing the judgment on that person, no.

Q. Could you explain that further, what do you mean passing judgment on the person?

A. If my answer was to pass judgment on that person, I would say no.

Q. You mean pass judgment as to what the punishment should be, you would say no to what?

A. I would say no to capital punishment.

Q. No matter what the evidence was, if you had to pass judgment, you would have to say no so that the death penalty could not be assessed?

A. Yes.

On further examination by appellant's attorney, Decuir stated that if she was under oath she would "... truthfully answer what is my opinion, I would not break the law by saying something that was not true." At this point, the Court attempted to clarify the situation by asking the following:

BY THE COURT: ... Can you answer one and two yes if the evidence supports it and you believe they should be answered yes, can you answer those questions yes notwithstanding what the consequences will be, without consideration of what the consequences are?

BY MS. DECUIR: Yes.

BY THE COURT: Can you set that aside and answer those questions based only on the evidence and answer those questions if the evidence supports it, yes, knowing that the death penalty will ensue?

BY MS. DECUIR: What I'm trying to get across is that I would answer the questions lawfully as to the evidence that was brought against the person. I would have to say, if the evidence proved him guilty, I would say yes, but as far as—I'm drawing a line, in other words.

BY THE COURT: What I'm trying to find is where that line is drawn.

BY MS. DECUIR: No to the death penalty, yes if he was proven guilty.

BY THE COURT: I want you to remember now, you're not asked to decide if he should get life or death. You're asked to determine if beyond a reasonable doubt, the defendant caused the death of the deceased deliberately and with reasonable expectation ... Assume, if you will, that those matters are proved conclusively. Can you answer those questions knowing the death penalty will result?

BY MS. DECUIR: Under oath I would have to answer yes.

BY THE COURT: The thing that Mrs. Turner has expressed is you're not required to take that oath, but once you take the oath, are you telling me you can answer those question [sic] without regard for what the consequences will be? Can you do that?

BY MS. DECUIR: Yes, sir.

BY THE COURT: And, will you take the oath?

BY MS. DECUIR: If it's required by law, yes, sir.

BY THE COURT: It's not required that you accept an oath, so I'm asking you, will you take the oath?

BY MS. DECUIR: No, sir.

BY THE COURT: You're going to refuse to accept the oath?

BY MS DECUIR: Yes, sir.

The voir dire examination of Decuir revealed a long held and firm opposition to the death penalty. Although Decuir stated that she would be able to answer the special issues, she also stated that she would not take the oath if not legally required. The character of her examination "presents an overall picture of a person whose strong and long held feelings of opposition toward death as a punishment for crime would prevent her from abiding by existing law or considering fairly the facts as adduced." *Vigneault v. State*, 600 S.W.2d 318, 326 (Tex.Cr.App.1980). In addition, her unequivocal statement that she would refuse to take the oath required of a juror would be sufficient to sustain a challenge for cause. Therefore, we find the trial court did not err when it sustained the State's challenge for cause.

■ Appellant also argues that the Court erred in sustaining the State's challenge for cause to venireperson Markowich. At the voir dire examination of Markowich, the prosecutor asked the following:

Q. [By Ms. Turner, prosecutor] ... We're asking for a verdict that would result in the death penalty and there are people who believe that is possibly committing murder themselves, that it's that wrong and there's nothing wrong with feeling that way, but it's just something that we need to know. Do you feel that maybe the state of Texas, in enacting that legislation, allowing for the death [p]enalty, is acting in the same way as committing the offense of murder?

A. I can't answer for the state, but only for myself. If I were on the jury and that was the way it was going, I would be very opposed to that. I'm not in favor of the death penalty at all.

\* \* \* \* \* \*

Q. ... Are you telling us that your views on the death penalty and your convictions are so strong that you could not take an oath knowing that there is a possibility of the death penalty being a result?

A. Yes, that's what I'm saying.

Q. So, regardless of what facts we put forward, what evidence we bring forth, you would lobby against the death penalty.

A. That's true.

Q. And, rather than take that oath, are you telling us that your convictions are so strong that you cannot take that oath to truly, to well and truly try the case and render a verdict according to the law?

A. I can render a verdict with imprisonment, but I'm not for the death penalty.

Appellant's attorney then engaged Markowich in rehabilitative questioning, in which Markowich stated in general terms that she could follow the law in answering the special issues. Markowich was then passed to the State, who asked the following:

Q. Could you answer that [Special Issue one] yes [sic] if we proved to you beyond a reasonable doubt that the only true answer is yes [sic]?

A. Yes.

Q. Okay, number two; whether there is a probability that he could commit criminal acts of violence that would constitute a threat to society in the future; if we proved to you beyond a reasonable doubt that that should be answered yes [sic], would you answer that yes [sic]?

A. Yes.

Q. Could you answer both of these yes [sic] if we proved to you, could you answer that yes [sic] knowing that by those yes [sic] answers, the Judge is going to assess the death penalty?

A. I don't know that, how can that be? Is this the second phase of the trial or the second trial? Does that automatically, if those questions are answered yes [sic], then that's automatically?

Q. Automatically. Therefore, I'm asking you, can you answer the questions yes [sic] if we prove to you beyond a reasonable doubt that they should be answered yes [sic], knowing that the Judge would assess the death penalty automatically?

A. I know that this sounds like a death penalty. Yes, but I'm not in favor of the death penalty; I'm sorry.

\* \* \* \* \* \*

Q. If we prove to you beyond a reasonable doubt that question number one should be answered yes [sic] and question number two should be answered yes [sic], can you answer them yes [sic] according to the oath, should take the oath, knowing that the Judge would assess the death penalty?

A. No, if the Judge assesses the death penalty, I will not take the oath. I'm not going to say yes.

During the State's initial examination, Markowich stated unequivocally that she was against the death penalty and that she would not take the oath to serve as a juror in a trial where the death penalty was a possible result. On later examination by the State, Markowich seemed to indicate that she could follow the law and truthfully answer the special issues. A review of the complete record of her examination, however, reveals that Markowich was confused by the questions and was unsure whether she was being questioned about the guilt/innocence or penalty phase of the trial. When asked if she could answer the questions knowing that the death penalty would result, her answer is ambiguous. She stated unequivocally, however, that she would refuse to take the oath, if the death penalty was a possibility. Once again, the record supports the trial court's finding that this venireperson's opposition to the death penalty would not allow her to follow the law. The trial court did not err in sustaining the State's challenge for cause. Appellant's points of error numbers four, five and six are overruled.

■ In his seventh point of error, appellant asserts that the trial court erred in sustaining the State's challenge for cause to venireperson Goosby. The State's challenge for cause was based on Goosby's

inability to read or write. Appellant contends that the evidence was insufficient to sustain the State's challenge. The State responds that Goosby was properly excluded under article 35.16, TEX.CODE CRIM. PROC.ANN.[4]

Before the voir dire examination, the trial court noted that Goosby had asked the clerk for help in filling out the juror questionnaire, and asked Goosby the following:

BY THE COURT: Without meaning to embarrass you in any way, Ms. Goosby, I need to know if you can read and write the English language?

BY MS. GOOSBY: No.

BY THE COURT: You can't write?

BY MS. GOOSBY: No.

Appellant's attorney then attempted to determine if Goosby had any ability to read or write by asking the following:

Q. [By Mr. Crow, appellant's attorney] ... When you say—in response to the Judge's question that you couldn't read or write, does that mean you can't do it at all or maybe you're a little bit limited in your ability to do it?

A. Well, I'll tell you what I can do. I can write my name, I can spell a little bit, but not so good because I didn't go to school enough to, you know, to learn how to read and write because I had to go to the field every day.

Q. How many years did you go to school?

A. I went to school about five years and I still can't, you know, read and write, because my mother and my father work on a farm and that's why I didn't go to school to learn how to read and write. But I can write my name real good and I can write some things real good and I can understand them real good.

Q. So what you're saying is you don't think you're real good at reading and writing but you can do some of it.

A. Yes, sir, I can but not too good.

4. TEX.CODE CRIM.PROC.ANN. § 35.16(a)(11) states in pertinent part:

(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve

on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:

\* \* \* \* \* \*

(11) That he cannot read or write.

The State then asked Goosby to read, from a chart, special issue number one of article 37.071. Goosby read part of the first sentence and could not continue further. When asked to read special issue number two, Goosby read approximately three words and no further. When asked if she could write down her feelings about the death penalty in one paragraph, Goosby replied that she could not.

Article 35.16(a)(11) requires of the prospective juror more than a very limited ability to read and write. Mere ability to read or write one's own name will not suffice. "The requirement contemplates that he [the prospective juror] shall be able to express his ideas in writing." *Hernandez v. State*, 506 S.W.2d 884, 887 (Tex.Cr. App.1974); *Johnson v. State*, 21 Tex.App. 368, 17 S.W. 252 (1893). This is a determination which rightfully belongs to the trial court and, absent an abuse of discretion, will not be disturbed on appeal. *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr.App.1979) (vacated and remanded on other grounds, 453 U.S. 902, 101 S.Ct. 3133, 69 L.Ed.2d 988 (1981)).

Two more recent cases indicate that a limited ability to read and write will not meet the literacy requirement for qualification as a juror. In *Allridge v. State*, 762 S.W.2d 146 (Tex.Cr.App.1988), *stay denied*, 488 U.S. 1026, 109 S.Ct. 835, 102 L.Ed.2d 968, *cert. denied*, 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989), venireperson Tobar volunteered "Well, here's the trouble with me. I don't know how to read or write too well, so I don't understand much about this." Tobar did not fill out his jury questionnaire "because I don't know how to write." Tobar had only gone to the fourth grade and had no other English training. When asked by appellant's counsel to read the three special issues of article 37.071, Tobar "mistook several words and stumbled through most of the sentences." Tobar could not find the word "provocation", did not know the meaning of "deceased," "religious preference," "sex of first child," or "occupation," and could not write down the name "Southwestern Press" as his former employer. Tobar read "from a fourth grade reader ... with some difficulty and stated that he understood 'some of that' but he could not write about what he had just read without copying from the book." *Id.* at 164. The trial court refused to allow appellant's attorney to further question Tobar and sustained the challenge for cause based on article 35.16(a)(11). This Court found that the evidence at voir dire was "convincing that Tobar was disqualified." *Id.* at 165. See also *Johnson v. State*, 773 S.W.2d 322 (Tex. Cr.App.1989).

In the instant case, venireperson Goosby demonstrated no more, and possibly less, ability to read and write than the venirepersons who were properly excluded for cause in *Allridge* and *Johnson*. Goosby was unable to read past three or four words in the special issues and stated that she could not write down her feelings about the death penalty. Although Goosby could read a few words and write her name, such ability is insufficient to meet the literacy requirement contemplated by article 35.16(a)(11). The trial court did not err in sustaining the State's challenge for cause. Appellant's point of error number seven is overruled.

In his eighth point of error, appellant asserts that the trial court erred in sustaining the state's challenge for cause to venireperson Williams. The State's challenge for cause was based on William's advanced state of pregnancy and a statement from her doctor that jury service could endanger the health of her and her baby. The State responds that Williams was properly excluded for cause under article 35.16(a)(5), TEX.CODE CRIM.PROC.ANN.[5]

---

5. TEX.CODE CRIM.PROC.ANN. article 35.-16(a)(5), Reasons for Challenge for Cause, states in pertinent part:

(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:

\* \* \* \* \* \*

(5) That he has such defect in the organs or feeling or hearing, or such bodily or mental defect or disease as to render him unfit for jury service, or that he is legally blind and the

Williams was the fifteenth venireperson questioned during voir dire and was accepted as a juror by both sides. Approximately two weeks later, Williams, who was in her eighth month of pregnancy, appeared before the trial court with a written statement from her doctor. Williams had previously explained to the trial judge that it was her doctor's opinion that it would be inappropriate for her to serve on the jury due to her physical condition because her baby was due at any time and there had been some complications that might cause her a medical problem (hypertension) and endanger the baby. In response to the appellant's attorney's questions, Williams indicated that she would be unable to serve for six weeks after the birth of her child. In response to questioning from the State, Williams responded that she would "probably not" be able to give her full attention to the trial proceedings on the days she felt "rotten." The State moved that Williams be excused for cause, claiming that "her physical condition is such to render her unfit for jury service." The trial court granted the motion to excuse Williams.

The trial court has responsibility for determining the qualifications of a prospective juror when a challenge for cause is made. *Villarreal v. State*, 576 S.W.2d 51, 63 (Tex.Cr.App.1978), *cert. denied*, 444 U.S. 885, 100 S.Ct. 176, 62 L.Ed.2d 114 (1979); TEX.CODE CRIM.PROC.ANN., article 35.-21; *McCary v. State*, 477 S.W.2d 624, 628 (Tex.Cr.App.1972). This Court has upheld challenges for cause based on a wide variety of physical problems. *Villarreal v. State*, supra (venireperson taking medication for high blood pressure and nervousness); *Redd v. State*, 578 S.W.2d 129 (Tex. Cr.App.1979) (venireperson had an inner ear problem which would keep her from coming to court if it acted up and was liable to do so at any time); *Hernandez v. State*, 643 S.W.2d 397 (Tex.Cr.App.1982), *cert. denied*, 462 U.S. 1144, 103 S.Ct. 3128, 77 L.Ed.2d 1379 (1983) (venireperson stated he had a sick mind, pneumonia and heart trouble and expressed doubt about his physical ability to serve as juror).

In the instant case, venireperson Williams was due to give birth during the middle of the trial. Williams also presented a statement from her doctor indicating that the hypertension associated with her pregnancy, combined with the stress and strain of sitting on the jury in a capital murder trial, might lead to complications which would endanger the health of her and her baby. Complications associated with pregnancy and delivery are conceivably within the range of problems contemplated by the language "bodily defect" in article 35.16(a)(5). The trial court was justified in sustaining the State's challenge for caused based on Williams physical inability to serve as a juror. Appellant's point of error number eight is overruled.

In his ninth point of error, appellant asserts that the trial court erred in retroactively sustaining the State's challenge for cause to venireperson Williams. Appellant contends that he relied on the prior acceptance of Williams as a juror in exercising his challenges on several subsequent jurors. Appellant claims that the trial court's action gave the State an unfair advantage by allowing the State to challenge the juror retroactively. The State responds that appellant's complaint on appeal does not comport with his objection made at trial and therefore is not properly preserved for appeal. The State further argues that appellant was granted two additional peremptory challenges and did not object to the composition of the jury at the completion of voir dire.

At the conclusion of the second voir dire examination of Williams, appellant's attorney made the following objection:

BY MR. CROW: We object to the Court granting this challenge for cause because the juror is qualified, that her condition is not one that renders her unfit. Under the 14th and 6th amendments she is qualified.

In order for an issue to be preserved on appeal, there must be a timely objection specifically stating the legal basis for the

court in its discretion is not satisfied that he is

fit for jury service in that particular area;

objection. An objection stating one legal basis may not be used to support a different legal theory on appeal. *Rezac v. State,* 782 S.W.2d 869, 870 (Tex.Cr.App.1990) (citing *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Cr.App.1977)); *Harris v. State,* 790 S.W.2d 568, 580 (Tex.Cr.App.1989); *Richardson v. State,* 744 S.W.2d 65, 70 (Tex.Cr. App.1987); *Graham v. State,* 546 S.W.2d 605, 609 (Tex.Cr.App.1977).

Appellant's objection at voir dire was limited to the basis of the challenge for cause, namely whether Williams physical condition made her unfit for jury service. Appellant did not object that the challenge for cause was sustained after both sides had already accepted Williams as a juror. The trial judge could not discern that this objection contained a legal theory asserting error in the granting of a retroactive challenge to a previously qualified juror. Thus, appellant's objection at voir dire failed to state the theory now being relied on for appeal. Since the trial judge did not have an opportunity to rule on an objection made as to the retroactive granting of a challenge for cause, nothing is presented for appellate review. *Rezac,* supra at 871; *Zillender,* supra at 517. Appellant's point of error number nine is overruled.

■ In his tenth point of error, appellant asserts that the trial court erred in admitting into evidence, over appellant's objection, autopsy photographs of the victim. Appellant contends that the probative value of the photographs was far outweighed by their prejudicial value. Appellant contends that the photographs are particularly gruesome in that they show damage to the body caused by animals and depict portions of the body that had been cut away during autopsy. Appellant asserts that since photographs of the victim's body from the scene of discovery had already been admitted, the admission of the autopsy photographs was duplicitous. The State responds that since a verbal description of the conditions depicted in photos was admissible, the photographs were also admissible. The State also responds that there is nothing in the record to indicate that the photographs depicted the body after being mutilated during the performance of the autopsy.

Dr. Parungoa, an Assistant Medical Examiner for Harris County, performed the autopsy of Tillerson's body. Parungoa described the contents of the six autopsy photographs as follows: photograph of the decedent with his clothing on showing his black jacket, his cowboy shirt and his blue jeans; photograph of the lower half of the body showing the boots and blue pants of the decedent; view of the head showing the gunshot wound; photograph showing the head and part of the body showing the gunshot wound of the arm and the gunshot wound of the head and the area where the animal ate the tissue; view of the left side of the head showing the entrance wound; photograph of the head showing the exit wound.

The autopsy photos were normal-sized and in color, and showed the victim's body fully clothed. Parungoa testified in detail as to the procedures for identification, and that he used the victim's clothing as one source for identification. Parungoa further testified as to the cause of death and used the photographs to explain to the jury the paths of the projectiles that caused Tillerson's death. Parungoa explained that some of the damage to the victim's body depicted in the photos had been caused by animals tearing at the tissue. Parungoa fully described the gunshot wounds to the head and arm, the state of decomposition, and estimated that Tillerson had been dead for at least one month. Parungoa testified that it was his opinion that the cause of death was the gunshot wound to the head.

This Court has previously considered the admissibility of autopsy photographs of murder victims. In *Burdine v. State,* 719 S.W.2d 309 (Tex.Cr.App.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987), the defendant challenged the admission of two photographs of the victim's body taken at the autopsy. The court summarized the case law governing the admission of photographs of victims.

The admission in evidence of photographs is within the discretion of the trial court, who determines whether they

serve a proper purpose in the enlightenment of the jury. *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980); *Terry v. State*, 491 S.W.2d 161 (Tex.Cr.App.1973). A photograph is admissible in evidence if a verbal description of what is depicted in the photograph is also admissible. *Brown v. State*, 696 S.W.2d 913 (Tex.Cr. App.1985); *Lewis v. State*, 676 S.W.2d 136 (Tex.Cr.App.1984). Only where the probative value of the photograph is small and its inflammatory potential great, will it be an abuse of discretion to admit the photograph. *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985). Hence, if a verbal description of the body of a murder victim would be admissible, a photograph of the body would also be admissible. *Adams v. State*, 685 S.W.2d 661 (Tex.Cr. App.1985).

\* \* \* \* \* \*

In determining whether the trial court erred in admitting the photographs in evidence, the controlling factor is whether the probative value of the photographs was greatly outweighed by their prejudicial effect. The prejudicial effect of the photographs may be determined by the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed, and by factors unique to each situation photographed. See generally *Martin v. State*, 475 S.W.2d 265 (Tex.Cr.App.1972); see also *Reimer v. State*, 657 S.W.2d 894 (Tex.App.—Corpus Christi 1983, no pet.).

*Id.* at 316.

This court has declined to distinguish between pre-autopsy and post autopsy photographs. Post autopsy photographs may be used as an "aid in interpreting and understanding the testimony adduced at trial." *Harris v. State*, 661 S.W.2d 106, 107 (Tex.Cr.App.1983). Photographs which emphasize the mutilation of the body caused in performing an autopsy may not be admissible. *Terry v. State*, 491 S.W.2d 161, 164 (Tex.Cr.App.1973). Where photographs will help the jury to understand technical testimony of an expert, such as a medical examiner, in describing the injuries sustained by a murder victim, a trial judge does not abuse his discretion in admitting such photographs. *Harris*, supra at 107.

In the instant case, the medical examiner used the autopsy photographs to illustrate and explain his testimony to the jury. The examiner's testimony as to identification of the victim and the cause of death was admissible. The photographs accurately depicted that testimony. Since verbal descriptions of the body, the identification of the body and the cause of death were admissible, the photographs were admissible unless their probative value was substantially outweighed by their prejudicial effect. Tex.R.Crim.Evid. 402.

Only a limited number of photographs were offered and those offered related directly to the medical examiner's testimony on identification and cause of death. The photographs were in color, but were of normal size and the body was clothed. The medical examiner attempted to explain what damage had been caused by the gunshot wounds and identified the damage caused by animals and decomposition. Some of the photographs were close-ups and showed the details of damage to the body. The photographs were no more gruesome than can be expected under the circumstances. There is nothing in the record or the photographs to support appellant's contention that portions of the body had been cut away during autopsy. Considering all factors, we cannot conclude that the probative value of the photographs was greatly outweighed by their prejudicial effect. Appellant's point of error number ten is overruled.

In his eleventh point of error, appellant asserts that the trial court erred in denying appellant's specially requested instruction number one. Appellant timely requested that the Court instruct the jury as follows:

> You are instructed that under our law one or more confessions, standing alone, are not sufficient to authorize a conviction for the alleged offense. So, if you

find from the evidence beyond a reasonable doubt that the defendant made one or more confessions to commission of the offense, still you cannot convict the defendant unless you find from the evidence beyond a reasonable doubt that there is other evidence before you in this case, which, of itself, tends to connect the defendant with the offense committed, if any, separate and apart from the alleged confession or confessions, if any, of defendant, and if you have a reasonable doubt that there is such other corroborative evidence, then you will acquit the defendant.

Appellant asserts that he was entitled to the instruction because there was no evidence, independent of his confessions, to prove that Tillerson's murder was committed in the course of robbery or kidnapping. Appellant concedes that he would not be entitled to the above corroboration charge, if the evidence was sufficient to show the corpus delicti of Tillerson's murder. Appellant admits that there was sufficient independent evidence to prove the corpus delicti of murder and only contests that the murder was committed in the course of committing a robbery or kidnapping. We take this point of error, in reality, to be a challenge to the sufficiency of the evidence to show that the murder was committed in the course of a robbery or kidnapping. Even though this ground is multifarious, we will address it anyway along with point of error number thirteen, which is a direct challenge to the sufficiency of the evidence showing the commission of a capital murder.

In the instant case, evidence that the murder was committed during the course of a robbery or kidnapping consisted of the following: Tillerson disappeared from his trailer on or about December 1, 1986; his body was found six weeks later approximately two and one-half miles from his trailer in a remote wooded area; the medical examiner determined that he had died from a gunshot wound to the head; there was no evidence that the wound was self-inflicted; Tillerson's trailer had been ransacked and several items were missing; some of these items were recovered from

the house of Billy Dan Atkins Jr.'s father, who had removed them from Atkins's car; a bayonet missing from Tillerson's trailer was recovered from Atkins's car. Appellant confessed that Tillerson had been killed at the edge of a wooded area consistent with the actual location of the body. Appellant confessed that he and Atkins had taken a bayonet from Tillerson's trailer and the same bayonet was recovered from Atkins' car. Appellant confessed that Atkins had taken items from Tillerson's trailer and put them in a box, and a box missing from Tillerson's trailer was recovered from Atkins' father's house.

In addition, uncorroborated aspects of appellant's confession indicate that the murder was committed during the course of a robbery and kidnapping. Appellant confessed that Atkins had removed several items from Tillerson's trailer while holding Tillerson at gunpoint. Appellant also confessed that Atkins and he had forcibly removed Tillerson from his trailer at gunpoint and transported him against his will to the spot where he was murdered. Appellant confessed to aiming his weapon at Tillerson during the car ride to the spot where he murdered Tillerson. We find that the evidence was sufficient to establish the elements of capital murder committed during the course of a robbery and kidnapping.

In his twelfth point of error, appellant asserts that the trial court erred in denying his specially requested charge on the lesser included offense of murder.

 In determining whether appellant is entitled to a charge on a lesser included offense, we will consider all of the evidence presented at trial. *Lugo v. State*, 667 S.W.2d 144 (Tex.Cr.App.1984). This Court has consistently applied a two-pronged test when reviewing whether a defendant was properly denied an instruction on a lesser included offense. First, the lesser included offense must be included within the proof necessary to establish the offense charged. Second, there must be some evidence in the record to establish that if the defendant is guilty, he is guilty of only the lesser includ-

ed offense. *Moreno v. State*, 721 S.W.2d 295, 302 (Tex.Cr.App.1986) (citing *Aguilar v. State*, 682 S.W.2d 556 (Tex.Cr.App. 1985)). Appellant meets the requirements of the first prong. This Court has held that murder is a lesser included offense of capital murder. *Thomas v. State*, 701 S.W.2d 653, 657 (Tex.Cr.App.1985); TEX. CODE CRIM.PROC.ANN., article 37.09(1). The question remains whether the record supports appellant's contention, that when considered as a whole, there is evidence that he is guilty only of murder.

Appellant does not guide us in his assertion. Appellant presented no evidence in his own defense. In his brief, appellant does not point to any specific evidence in the record which supports the requested charge on the lesser included offense of murder. Nothing in the record controverts the State's evidence that: appellant and his cohort Atkins held Tillerson at gunpoint while they ransacked his trailer and removed his property; or that they forced Tillerson out of his trailer at gunpoint and transported him forcibly to the place where he was murdered. There is no evidence in the record from which a rational trier of fact could conclude that appellant was guilty only of murder. Appellant's point of error number twelve is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., concurs in the result.

MILLER, J., concurs in result reached in points # 1 and # 3.

TEAGUE, J., dissents.

STURNS, J., not participating.