Hai Hai VUONG a/k/a Hai Kien Vuong, Appellant,

v.

The STATE of Texas, Appellee.

No. 70402.

Court of Criminal Appeals of Texas, En Banc.

Jan. 8, 1992.

---

930

James A. DeLee, Port Arthur, for appellant.

Tom Maness, Dist. Atty., and John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appellant was convicted of capital murder. Tex.Penal Code § 19.03(a)(6). At the punishment stage of the trial, the jury answered "yes" to each of the three issues prescribed by Article 37.071(b) of the Texas Code of Criminal Procedure. As required by Article 37.071(e) of the Code, the trial judge sentenced Appellant to death. Direct appeal to this Court is automatic. Tex.Code Crim.Proc. 37.071(h). Appellant asserts twelve points of error. We will affirm.

Appellant's fourth point of error asserts that the evidence at trial was insufficient to sustain a conviction for capital murder. We briefly summarize the relevant evidence adduced at the guilt-innocence stage of Appellant's trial, as viewed in the light most favorable to the verdict.

On December 7, 1986, Appellant was playing pool at the Tam Game Room ("Game Room")—a Vietnamese pool room and cafe—located in Port Arthur. Appellant left the premises and returned a short time later, accompanied by his friend Thien. Upon their return, Appellant, now armed with a semi-automatic rifle, entered the front door of the pool room, while Thien, armed with a pistol, stationed himself by the entrance to the cafe portion of the Game Room. Appellant then fired at least two shots into the ceiling, while warning the patrons not to try and leave. Appellant proceeded through the pool room firing a number of short bursts from his weapon, killing one individual and severely wounding three others. He then entered the cafe and fired his weapon point blank at a seated sixteen-year-old patron, killing him.

Of the approximately eleven shots fired by Appellant during this enterprise, seven struck individuals, two of whom were killed. Witness testimony depicted Appellant as walking methodically through both rooms and taking deliberate aim at his victims. All of the victims were unarmed.

In contrast to the evidence presented by the State, Appellant's confession and trial testimony sought to portray the conduct of Appellant as the product of irrational thinking, caused by earlier threats against Appellant by certain Vietnamese gang members. Appellant asserted that his intent upon returning to the Game Room with the automatic weapon was only to scare the gang members who had threatened him. However, Appellant himself testified that none of his victims were gang members. Appellant also contended, at various points in his testimony, that the shootings were accidental, self-defense, and/or the product of a runaway gun. Of course, the weight and credibility of Appellant's testimony was a matter for the jury to determine.

When addressing a sufficiency of the evidence argument, the reviewing court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Butler v. State,* 769 S.W.2d 234, 239 (Tex. Cr.App.1989), quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Appellant's own testimony, as well as the overwhelming testimonial evidence offered by the various eyewitnesses, clearly demonstrates that Appellant shot and killed the two victims. In its brief, however, Appellant emphasizes that

the State did not prove that Appellant intentionally or knowingly killed the two victims—pointing instead to a lack of motive and Appellant's "irrational thinking and behavior."

 Appellant's use of a deadly weapon in a tavern filled with patrons supplies ample evidence for a rational jury to conclude beyond a reasonable doubt that Appellant had the requisite intent to kill: "The specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result." *Godsey v. State,* 719 S.W.2d 578, 580–81 (Tex.Cr.App.1986). Clearly, the use of an automatic weapon under these circumstances was a "manner of use" in which death or serious bodily harm was a likely result. In addition, there are a number of other factors that could have led a jury to reasonably believe Appellant's conduct was knowing or intentional, including: (1) the testimony of witnesses concerning Appellant's calculated demeanor, (2) evidence showing that seven of the approximately eleven shots fired during the criminal episode struck human targets, and (3) the fact that the victim Tien was shot twice directly in the face and the victim Hien was killed by a bullet that hit him squarely in the chin. Finally, we note that it is not required that the State show a motive in order to sustain a conviction of capital murder. *Garcia v. State,* 495 S.W.2d 257, 259 (Tex.Cr.App.1973).

In sum, the evidence adduced at the guilt-innocence stage of Appellant's trial was such that any rational trier of fact could have found that the State proved every essential element of its case beyond a reasonable doubt. Appellant's fourth point of error is overruled.

 Appellant's first point of error charges the evidence was insufficient to sustain an answer of "yes" to issue number two, submitted to the jury at the punishment phase of the trial.[1] We reject Appellant's argument.

At the punishment stage of Appellant's trial the State presented the following evidence: (1) Appellant's prior conviction for driving while intoxicated, for which he was put on probation; (2) a motion filed to revoke this probation, precipitated by Appellant's failure to comply with the terms of his probation agreement; and (3) an unadjudicated extraneous offense involving Appellant's arrest in connection with the seizure of weapons and allegedly illegal narcotics. In addition, there was expert psychiatric testimony that Appellant would be a continuing threat to society. Finally, the State presented the testimony of a second expert specializing in Vietnamese crimes and gangs, who testified that Appellant fit the profile of a typical Vietnamese gang member and that Appellant would constitute a future threat to society.

 The standard of review for an insufficiency of the evidence claim as to special issue two is the same as set forth in our disposition of the preceding point of error; that is, whether the evidence, when viewed in the light most favorable to the verdict, would lead any rational trier of fact to find beyond a reasonable doubt that the answer to the special issue is "yes." *Valdez v. State,* 776 S.W.2d 162, 166 (Tex. Cr.App.1989). The jury may consider many factors when determining whether a defendant will be a continuing threat to society including, but not limited to, the following:

1. The circumstances of the capital offense, including the defendant's state of mind and whether he was acting alone or with others;

1. At the time of Appellant's trial, Tex.Code Crim. Proc. art. 37.071 provided, in relevant part:
 (b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:
 \* \* \* \* \* \*
 (2) whether there is a probability that the defendant would commit criminal acts of vio-

lence that would constitute a continuing threat to society.

2. The calculated nature of the defendant's conduct;

3. The deliberateness exhibited in the execution of the crime;

4. The existence and severity of any previous offenses committed by the defendant;

5. The defendant's age and personal circumstances at the time of the offense;

6. Whether, at the time of the offense, the defendant was acting under duress or the domination of another;

7. Psychiatric evidence; and

8. Character evidence.

*Valdez*, supra; *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Cr.App.1987).

 When answering special issue two, the jury may properly consider all of the evidence adduced at the guilt stage of the trial. *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App.1986). The circumstances of the offense alone, if severe enough, can sustain an affirmative answer to special issue two as against a sufficiency challenge. *Burdine v. State*, 719 S.W.2d 309, 315 (Tex.Cr.App.1986).

Appellant argues that our resolution of his point of error should be governed by those prior decisions from this Court holding the evidence insufficient to sustain an affirmative answer to special issue two. See *Huffman v. State*, 746 S.W.2d 212 (Tex.Cr.App.1988), *Beltran v. State*, 728 S.W.2d 382 (Tex.Cr.App.1987); and *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982). The State counterargues that the circumstances of the offense in the instant case, alone, are sufficient to sustain the jury's affirmative answer to special issue two. The State further asserts that the evidence produced at the guilt-innocence stage, when combined with the evidence offered at punishment, is equal or superior to that found sufficient in many of this Court's previous cases addressing this issue.

 When the sufficiency of the evidence offered at punishment is challenged, this Court may examine other cases where the State has failed to present sufficient evidence. *Huffman*, supra. We have therefore reviewed those cases cited by Appellant, inter alia. See *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1982); *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App. 1980); *Wallace v. State*, 618 S.W.2d 67 (Tex.Cr.App.1981); *Beltran*, supra; *Huffman*, supra; and *Roney*, supra. We note, however, that each case must be resolved on its own facts. *Santana*, supra.

 When reviewing such a sufficiency challenge it is appropriate for this Court to consider a number of factors, including: (1) the lack of psychiatric testimony concerning future dangerousness; (2) whether the circumstances of the crime indicate the defendant engaged in the criminal conduct without the intent to murder or commit other acts of violence; (3) the extent of a defendant's prior convictions; (4) the violent nature of a defendant's prior convictions and other unadjudicated offenses; (5) the age of the defendant at the time of the crime; and (6) whether the defendant was intoxicated or acting under other circumstances indicating a diminished mental capacity. *Id.*, see also *Robinson v. State*, 548 S.W.2d 63, 64 (Tex.Cr.App.1977). Of course, no one factor is dispositive, and the jury's affirmative answer to special issue two may withstand a sufficiency challenge notwithstanding the lack of evidence relating to one or more of these factors.

We find the cases cited by Appellant, inter alia, distinguishable from the instant case. As the facts set forth in our resolution of the preceding point of error demonstrate, the circumstances of this crime were of such a calculated, brutal, and senseless nature that based solely on the evidence presented at the guilt stage of Appellant's trial a rational jury could have found beyond a reasonable doubt that Appellant was a continuing threat to society. When this evidence is coupled with the expert psychiatric testimony and the evidence of prior extraneous offenses offered at punishment, we find that the evidence was clearly sufficient to sustain a jury's affirmative answer to special issue two. Appellant's first point of error is overruled.

 The second point of error presented by Appellant asserts the trial court committed reversible error by admitting into

evidence Appellant's statement to police when such statement was not voluntarily given. At the guilt-innocence stage of Appellant's trial, he testified in his own behalf. On cross-examination, the State sought to impeach Appellant's testimony with his prior written confession, at which point Appellant immediately objected to its admissibility. A hearing was then had outside the presence of the jury to determine the voluntariness of the confession under Article 38.22 of the Texas Code of Criminal Procedure. See also, *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). At the conclusion of the hearing, the trial judge ruled the confession admissible for impeachment purposes only, pursuant to Article 38.22 § 5.[2] The trial judge subsequently issued a jury instruction properly limiting the jury's consideration of Appellant's statement.

Appellant complains his confession was involuntary because he was told what to write by law enforcement officials. We disagree. Appellant's own testimony reveals that the only portion of the statement he was instructed to write was that part reflecting the *Miranda* warnings and waivers required by Tex.Code Crim.Proc. art. 38.22 § 2(a). See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The warnings required by Article 38.22 do not constitute any part of the body of Appellant's "confession." The mere fact that the interrogating officer told him to write down these rights, in Vietnamese,

before commencing with the substance of his confession has no bearing on the voluntariness of the statement. The remainder of Appellant's statement was, according to Appellant's own testimony, freely and voluntarily given.[3]

Appellant also urges that his statement was not voluntary because of the use of an interpreter to assist during the making of the statement and to explain to Appellant his relevant constitutional and statutory rights. Although Appellant has failed to adequately brief this point or to demonstrate the specific connection between the use of an interpreter and the voluntariness of Appellant's statement, in the interests of justice we will address this contention.

Appellant's only substantive contention is that the original (Vietnamese) version of Appellant's confession is worded incorrectly in that it says that any statement made by Appellant might be used "for or against" him. Appellant argues that this renders the statement inadmissible under *Dunn v. State*, 721 S.W.2d 325 (Tex.Cr. App.1986). We reject this argument.

The record reveals that prior to the trial court's ruling on the admissibility of Appellant's statement, the following exchange occurred between defense counsel and the interpreter at trial (who was a different individual than the interpreter provided at

---

**2.** When the trial judge ruled that Appellant's statement was voluntary, he failed to make the necessary findings of fact and conclusions of law as required by Tex.Code Crim.Proc. art. 38.22 § 6. We abated Appellant's appeal and ordered the trial court to make such findings. See, e.g., *Butler v. State*, 790 S.W.2d 661 (Tex.Cr. App.1990); *Wicker v. State*, 740 S.W.2d 779 (Tex.Cr.App.1987), cert. denied, 485 U.S. 938, 108 S.Ct. 1117, 99 L.Ed.2d 278 (1988). Having received these findings of fact and conclusions of law back from the trial court, we are now able to address the merits of Appellant's arguments concerning the voluntariness of his statement.

**3.** See, e.g., R.XIII, p. 361–62:

Q. [BY THE STATE] All of this on the first page [i.e., the *Miranda* warnings], Anh Nguyen [the translator] told you what to write down? Is that correct?

A. [APPELLANT] Yes, sir.

Q. And, then, Anh Nguyen and Ron Robertson [the interrogating officer] wanted you to write down what happened in the Game Room? Is that correct?

A. Yes. *That part written by me.*

\* \* \* \* \* \*

Q. [BY DEFENSE COUNSEL] Did they tell you what to write? Did they tell you their idea of what happened in the Game Room, or did they ask you to tell them what happened?

A. I don't remember for sure, but the first five numbers [the *Miranda* warnings], they— that, when he told me to write it, and after that, he asked me why this happened in the Game Room. Isn't that enough—*I wrote the statement myself.*

(emphasis supplied).

the time Appellant gave his written statement to law enforcement officials):

Q. [BY DEFENSE COUNSEL]: Then, give us [*Miranda* warning] Number One.

A. [INTERPRETER] [quoting from the original (Vietnamese) statement]: "I have the right to be silent, and refuse to write this statement, which will be used against me." I don't understand what that means.

Q. Does that statement say that that document can be used for or against him?

A. Yes.

Q. Does it say that?

A. Yes. I think so. It says, "I have a right to be silent, and refuse to write this statement, which will be used against me."

Q. Does it say "for or against me."

A. No. Just "against me."

The interpreter admittedly answered "yes" when asked if the document read "for or against me." However, both times the interpreter directly interpreted the original statement, he expressed that the document read: "which will be used against me." When asked a second time if the statement said "for or against me" the interpreter unequivocally said it did not. At no point in the record does Appellant state that he *understood* the warning to mean "for or against" him.

This contradictory testimony was but one consideration in the trial court's overall determination of the voluntariness of Appellant's statement. As stated above, the trial judge found as a matter of fact that Appellant's statement was "freely and voluntarily made without any compulsion or persuasion, and that it was an exercise by the Defendant of his own complete and absolute free will." R.I. (3d supp.). As a conclusion of law, the trial judge found: "This confession was clearly voluntary under all traditional standards for evaluating voluntariness and trustworthiness, and it is therefore admissible in evidence as a matter of law." *Id.*

There is no other evidence in the record that Appellant's interpreter at the time of his confession or at the time of trial was inadequate. See *Ortega v. State,* 659 S.W.2d 35, 39 (Tex.Cr.App.1983). We reiterate that Appellant's original confession was written by him in Vietnamese. Appellant was free at trial to attack any defects in the translation from Vietnamese to English. He failed to do so. Consequently, absent some other indicia of unreliability, both the original (Vietnamese) and the translated (English) versions of Appellant's confession were properly admissible before the jury for the limited purposes for which they were admitted.

In conclusion, there is absolutely nothing in the record to even suggest the possibility that Appellant's statement was the product of duress, deception, coercion, improper influence, overbearing of will, or any other illicit means. And because the record is utterly devoid of any evidence that Appellant's statement was involuntary under the traditional standards for evaluating voluntariness and trustworthiness, we find the trial judge did not abuse his discretion in admitting the statement pursuant to Tex. R.Crim.Proc. art. 38.22 § 5. *Huffman v. State,* 746 S.W.2d 212, 220–21 (Tex.Cr.App. 1988); *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). Appellant's second point of error is overruled.

 In point of error number three, Appellant argues that the trial judge erred by allowing testimony of an extraneous offense presented during the punishment phase of the trial because this testimony was the fruit of an illegal search and seizure.

The objectionable testimony came from Officer Darrell Lee, who testified that on August 18, 1986, he responded to a disturbance call at a local hotel. The officer then proceeded to the room in question, knocked on the door, and was allowed entrance by a male Vietnamese. Upon entering the room, the officer noticed four other Vietnamese men and detected the smell of something burning. While his partner stood near the front door, Officer Lee went to the bathroom to make sure there was no one else occupying the premises. In the bathroom he noticed a brown prescription bottle containing a greenish liquid and a

syringe. Nearby there were two additional empty syringes. Upon seeing these suspected illegal narcotics, the officers then cursorily searched the premises, discovering several weapons and approximately one hundred rounds of ammunition. The officers arrested the five Vietnamese, one of whom was Appellant. At various times during the testimony of Officer Lee, Appellant timely objected to such testimony as being the fruit of an illegal search. The trial judge overruled each objection.

Appellant now asserts that the trial court committed reversible error in allowing testimony concerning this evidence, when such evidence was obtained in violation of Appellant's constitutional or statutory rights.[4] See, e.g., *Zimmerman v. State,* 750 S.W.2d 194 (Tex.Cr.App.1988).

Assuming, arguendo, that error was preserved, we find on reviewing the uncontradicted testimony of Officer Lee absolutely no merit to Appellant's claim that the officer's arrest of Appellant and the seizure of weapons and contraband was illegal. The testimony of Officer Lee reveals that his presence at the hotel was in response to a legitimate complaint by the proprietor and that he was voluntarily admitted into the room to investigate this complaint. The subsequent cursory search of the hotel room was founded on a reasonable need to secure the premises. The allegedly illegal narcotics were in the officer's plain view and properly seized. The arrest of the men and the search for contraband was founded on probable cause, sufficiently formed when the officer happened upon these suspected narcotics. Consequently, viewing the record in the light most favorable to the ruling of the trial court, we find no error in the court's overruling of Appellant's motion. Appellant's third point of error is overruled.

■■■ In his fifth point of error, Appellant contends that the trial judge erred by not including a charge on voluntary manslaughter in its jury charge at the guilt stage of the trial. We reject this contention.

A charge on voluntary manslaughter should be given only when there is evidence presented that the defendant acted under the "immediate influence of sudden passion arising from an adequate cause." Tex.Penal Code § 19.04(a); see also *Marquez v. State,* 725 S.W.2d 217, 223–24 (Tex. Cr.App.1987). "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." Tex.Penal Code § 19.04(b); see also *Marras v. State,* 741 S.W.2d 395, 405 (Tex.Cr.App.1987). "Adequate cause" is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex.Penal Code § 19.04(c).

In the instant case, Appellant presented absolutely no evidence of adequate provocation by the two individuals he killed. Appellant's own testimony was that he returned to the bar with a gun after being threatened by Vietnamese gang members. Appellant further testified that neither of the two murder victims was a member of a gang. Moreover, there is no indication in the record that Appellant believed, at the time of the murders, that either victim was a gang member. Thus, even assuming that the conduct of the *gang members* was sufficiently provocative to warrant a charge on voluntary manslaughter, the fact that neither *victim* was associated with these gang members forecloses such a charge.

■■■ Appellant also asserts that he shot one of the victims, Tien, because he had heard that Tien always carried a gun and thought he might have been going for a gun. Appellant similarly testified that he shot the other victim, Hien, because he was

---

4. Tex.Code Crim.Proc. art. 38.23(a) provides in relevant part:

No evidence obtained by any officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

startled when Hien pushed the table away and attempted to stand up. In actuality, neither victim was armed. Notwithstanding Appellant's explanations of why he shot the two victims, the fact remains that this proof is not sufficient to warrant an instruction on voluntary manslaughter. The shootings of both victims began after Appellant had initiated the criminal episode by entering the bar and firing his weapon. Once Appellant began shooting, both victims were justified in using reasonable means, including deadly force, to escape or prevent further violence. When a defendant begins a violent criminal episode his or her subsequent acts of violence cannot constitute an "adequate cause" so as to warrant an instruction on voluntary manslaughter. *Harris v. State*, 784 S.W.2d 5, 10 (Tex.Cr.App.1989). To hold otherwise "would allow criminals a justifiable reason for killing their victims who rightly seek to protect themselves or others from criminal activity." *Id.*

When the record shows—as this one clearly does—no legally sufficient evidence of provocation by the deceased, or another acting in concert with the deceased, the offense of voluntary manslaughter is simply not raised. *Marquez*, supra at 224. The trial court did not err in denying Appellant's requested charge on voluntary manslaughter. Appellant's point of error number five is overruled.

■ Appellant's point of error number six asserts the trial judge's charge to the jury at the guilt phase of the trial was "improperly presented and of an improper sequence," thereby constituting an improper comment on the weight of the evidence and thus violating due process. We disagree.

The charge given at the guilt phase of Appellant's trial consisted first of the necessary definitions, followed by the charge on capital murder. Next in sequence were the charges on the lesser-included offenses of intentional murder and involuntary manslaughter, with respect to each victim. The charge concluded with the trial judge's general instructions to the jury.

Appellant contends that, to be legally permissible, the trial judge should be required to place a jury charge on capital murder after the charges instructing the jury as to the lesser-included offense of murder and involuntary manslaughter. Appellant contends that his suggested placement of the various charges more accurately reflects the thought-processes of the jury; in other words the jury must deliberate first on Appellant's guilt as to one victim, then as to the other, then as to whether the murders were committed in the same criminal transaction. Although Appellant cites this Court to no relevant authority, he supports his position by analogizing to the general enhancement procedure utilized at sentencing: "in this type of capital murder, Appellant asserts that the jury should be charged to consider murders first and then the enhancement concept that they both occurred during the same transaction." Appellant's analysis is unpersuasive.

■ As regards the organization of the jury charge, there is no substantive distinction between capital murders prosecuted under Tex.Penal Code §§ 19.03(a)(2) and 19.03(a)(6). Each subsection consists of an intentional murder coupled with a specific aggravating element. With respect to capital murders prosecuted under § 19.03(a)(2), previous cases from this Court illustrate the appropriateness of the jury's consideration of the primary charge of capital murder, then, if necessary, consideration of the lesser-included offenses. See *O'Pry v. State*, 642 S.W.2d 748, 765 (Tex.Cr.App.1982) (opinion on rehearing); *Clark v. State*, 717 S.W.2d 910, 918 (Tex. Cr.App.1986). We hold this same principle true for capital murders prosecuted under § 19.03(a)(6).

Put simply, Appellant was indicted for the offense of capital murder. At trial the State bore the burden of proving all elements of that offense beyond a reasonable doubt. That was the primary charge for the jury to consider and it was clearly appropriate for them to focus initially on this determination. Of course, the State also had the right to have the jury consider

the lesser-included offenses of murder and involuntary manslaughter. See, e.g., *Ex parte McClelland*, 588 S.W.2d 957, 959 (Tex.Cr.App.1979); P. McClung, *Jury Charges for Texas Criminal Practice* 60, 79–80 (Rev. ed. 1990). Indeed, the submission of lesser-included offenses is required by the double jeopardy clause of the fifth amendment of the United States Constitution in order to protect a criminal defendant from the unfair burden of successive trials. See *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990).

As the State points out in its brief, it is axiomatic that a reviewing court will not condemn a jury charge unless it is misleading when read as a whole. *Christian v. State*, 71 Tex.Crim. 566, 161 S.W. 101, 104 (1913). The trial judge's submission of a charge comprising capital murder, murder, and involuntary manslaughter, when construed in its entirety, correctly presented the relevant law in a manner not likely to be misconstrued by the jury. See *Mangan v. State*, 168 Tex.Crim. 265, 324 S.W.2d 849, 851 (1959). Point of error six is overruled.

■ In point of error number seven, Appellant complains that Appellant was denied equal protection of the laws. The thrust of this argument seems to be that Appellant was denied a fair trial because he was sentenced to death by a jury "with no understanding of the cultural concepts and mores of the Oriental people, and with little or no understanding as to their thought processes, which must be different than ours." Appellant's Brief at 29–30. Appellant cites this Court to no specific constitutional provision, statutory authority, or case law to support this claim. Consequently, we consider this point of error to be inadequately briefed and will not address it. See Tex.R.App.Proc. 74(f) and 203; see also, *Castillo v. State*, 810 S.W.2d 180, 182, fn. 1 (Tex.Cr.App.1990).

■ In points of error eight and ten, Appellant argues, respectively, that he was improperly indicted and convicted under an unconstitutional statute. Although Appellant's arguments are opaque and overbroad, the gist of this point of error appears to be that the statute under which Appellant was indicted and convicted—Tex.Penal Code § 19.03(a)(6)(A)—is unconstitutionally vague and/or fails to sufficiently narrow the class of persons subject to the penalty of death, as required by *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The relevant statutory provision is § 19.03(a)(6)(A) (emphasis supplied), which provides:

A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

(6) the person *murders* more than one person:

(A) during the same criminal transaction[.]

Appellant argues that the failure of the statute to specifically define the term "murders"[5] in subpart (6) renders the statute void because it "actually enlarges the spectrum of selection of possible [capital] cases without specifically stating or isolating special types of multiple homicides." In other words, Appellant argues the statute is vague because it can be construed in more than one manner: either (1) all of the murders must be committed intentionally or knowingly, as specified in § 19.02(a)(1); or (2) only one person need be murdered intentionally or knowingly, the additional murder(s) being any of those defined under § 19.02. In apparent pursuit of his vagueness argument, Appellant also poses the following rhetorical question for this Court

---

5. Murder is defined in Tex.Penal Code § 19.02(a):

A person commits an offense if he:
(1) intentionally or knowingly causes the death of an individual;
(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or
(3) commits or attempts to commit a felony, other than voluntary or involuntary manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

to ponder: "Furthermore, what constitutes the same criminal transaction?"

■ Before this Court will address the merits of Appellant's claim that § 19.-03(a)(6)(A) is unconstitutional, he must first make a showing that the statute is unconstitutional as applied to him. *Parent v. State*, 621 S.W.2d 796, 797 (Tex.Cr.App. 1981). That the statute may be, in its operation, unconstitutional as to others is not sufficient. *Id.* The natural corollary to this principle is that an appellant to whom a statute clearly applies may not successfully challenge it for vagueness. *Briggs v. State*, 740 S.W.2d 803, 806 (Tex. Cr.App.1987); *Parker v. Levy*, 417 U.S. 733, 746, 94 S.Ct. 2547, 2557, 41 L.Ed.2d 439 (1974); see also, *Village of Hoffman Estates, et al. v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S.Ct. 1186, 1191–92, 71 L.Ed.2d 362 (1982) (One "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others").

In the case at bar, Appellant's indictment charged that he "intentionally and knowingly cause[d] the death" of both victims. At the conclusion of the guilt phase of the trial, the trial judge charged the jury that: "A person commits the offense of murder if he intentionally or knowingly causes the death of an individual." Appellant was thus doubly protected against any potential vagueness in the statute: first, there was an indictment that required the State to prove that Appellant intentionally or knowingly killed both victims; second, there was a jury charge that defined murder only in terms of an intentional or knowing killing. It is apparent to this Court that the jury found, as a matter of fact, that defendant intentionally or knowingly killed both victims.

We also find that the term "same criminal transaction," certainly is not vague as applied to the facts of this case. The record reveals that Appellant killed the two victims in a continuous and uninterrupted chain of conduct occurring over a very short period of time. Similarly, Appellant's own voluntary statement, admitted into evidence at trial, reveals that both killings occurred in a rapid sequence of unbroken events. Even the most narrow construction of the term "same criminal transaction" would include the type of actions the jury determined were committed by Appellant. In sum, there is absolutely no showing that § 19.03(a)(6)(A) was vague as to *this* appellant. Appellant's conduct could not more clearly fall within the plain language of § 19.03(a)(6)(A).

■ Appellant also makes a general claim that § 19.03(a)(6)(A) is violative of the United States Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), because it fails to sufficiently narrow the class of persons subject to the death penalty. We disagree. The addition of § 19.03(a)(6)(A) to the capital-punishment statute affects only that very small and specifically identifiable category of persons adjudged guilty of murdering more than one individual in a single criminal transaction. As the Supreme Court noted in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), such a statutory scheme is constitutionally sound:

> We conclude that Texas' capital-sentencing procedures ... do not violate the Eighth and Fourteenth Amendments. By narrowing its definition of capital murder, Texas has essentially said that there must be at least one statutory aggravating circumstance in a first-degree murder case before a death sentence may even be considered.... Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution.

(citing *Furman v. Georgia*, 408 U.S. 238, 310, 92 S.Ct. 2726, 2762–63, 33 L.Ed.2d 346 (1972)). The "aggravating circumstance" in § 19.03(a)(6)(A) is the murder of an additional person. Moreover, because it is beyond rational dispute that murder is, qualitatively, at least as aggravating a circumstance as those upheld in *Jurek* (e.g., rape, robbery, burglary), we reject Appellant's argument that the statutory addendum is

unconstitutional. Appellant's eighth and tenth points of error are overruled.

■ Appellant's point of error number nine asserts that the trial court erroneously allowed State's expert Robert Casey to testify at the punishment phase of the trial. Appellant's specific objection at trial was that the State failed to provide Appellant with reasonable notice of Casey's testimony as required by Rule 404(b) of the Texas Rules of Criminal Evidence.[6] We disagree.

■ Rule 404(b) is inapposite to our disposition of this point of error. In deciding questions concerning the admissibility of character evidence at the *punishment* stage of the trial, the appropriate governing statute is Rule 404(c) of the Texas Rules of Criminal Evidence.[7] Rule 404(c) contains no notice provision, nor does Article 37.071 of the Texas Code of Criminal Procedure, the provisions of which specifically govern the scope of Rule 404(c) in capital murder cases. Appellant's ninth point of error is overruled.

■ In points of error number eleven and twelve, Appellant argues that the trial judge erroneously excluded prospective jurors Patricia Fehrenbacher and Harold Gauthier based on their opposition to the death penalty. We reject Appellant's arguments with respect to both venirepersons.

The two venirepersons were struck for cause under Article 35.16 of the Texas Code of Criminal Procedure, which provides in relevant part:

(b) A challenge for cause may be made by the State for any of the following reasons:

(1) That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty;

\* \* \* \* \* \*

(3) That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

During their voir dire examinations, both prospective jurors manifested a clear disbelief in capital punishment. See Appendix. Consequently, each venireperson demonstrated bias against a phase of the law upon which the State was entitled to rely for punishment sufficient to warrant exclusion under the plain language of Article 35.16(b)(3).

This finding does not, however, end the inquiry. The exclusion of a juror must satisfy not only the relevant statutory provisions but also the constitutional limits placed on such exclusion by the United States Supreme Court. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court held that a prospective juror may be excluded for cause only when the juror's views on capital punishment are such that they would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

■ In applying the *Witt* standard, trial judges must seek to balance the right of the State to seat impartial jurors capable of conscientiously applying the law against the constitutional right of defendants to empanel jurors who, although morally or religiously predisposed against the death penalty, can nonetheless render a decision consistent with their oath and the trial judge's instructions. Thus, this Court has

---

6. Rule 404(b), Tex.R.Crim.Evid. provides, in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes ... provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief such evidence other than that arising in the same transaction.

7. Rule 404(c) of the Texas Rules of Criminal Evidence states:

In the penalty phase, evidence may be offered by an accused or by the prosecution as to the prior criminal record of the accused. Other evidence of his character may be offered by an accused or by the prosecution. Nothing herein shall limit provisions of Article 37.071, Code of Criminal Procedure.

held that prospective jurors may not be excused merely because their beliefs about the death penalty might influence the decision-making process. *Rogers v. State*, 774 S.W.2d 247, 253 (Tex.Cr.App.1989); see also, *Ex parte Williams*, 748 S.W.2d 461 (Tex.Cr.App.1988).

 In reviewing a decision by the trial judge to sustain a challenge for cause, the correct standard of review is whether the totality of the voir dire testimony supports the trial judge's implied finding of fact that the prospective juror is unable to take the requisite oath and to follow the law as given by the trial judge. *Goodwin v. State*, 799 S.W.2d 719, 731 (Tex.Cr.App. 1990). An appellant complaining of an erroneously excluded juror must demonstrate one of two things: (1) the trial judge applied the wrong legal standard in sustaining the challenge for cause, or (2) the trial judge abused her discretion in applying the correct legal standard. *Id.*

It is obvious from the record that the trial judge applied the correct legal standard in sustaining the State's challenges for cause at issue in this case. With regard to prospective jurors Fehrenbacher and Gauthier, the questions asked by both the prosecutor and defense counsel clearly were designed to ascertain whether or not the jurors were excludable under the appropriate standard set forth in *Witt*. See Appendix. Moreover, the trial judge's rulings in sustaining the State's challenges were predicated directly on *Witt*. Consequently, any error by the trial judge must arise from abuse of discretion.

 When analyzing the propriety of a trial judge's decision to sustain a challenge for cause, the reviewing court must recognize that it is faced with only a cold record. Perforce, when undertaking an abuse of discretion review, the juror's bias need not be proven with "unmistakable clarity":

Despite ... lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... this is why deference must be paid to the trial judge who sees and hears the jurors.

*Witt*, 469 U.S. at 425–26, 105 S.Ct. at 852–53; see also, e.g., *Andrews v. State*, 744 S.W.2d 40 (Tex.Cr.App.1987). Therefore, this Court grants considerable latitude to the trial judge, who had the opportunity to directly observe the demeanor of the venireperson. *Foster v. State*, 779 S.W.2d 845, 852 (Tex.Cr.App.1989).

This need for deference is especially critical when the reviewing court is faced with a record that demonstrates equivocation, vacillation, or uncertainty in a venireperson's responses. In *Goodwin*, this Court held that:

[W]hen faced with the ambiguous voir dire record of a venireperson who indicates both an inability to follow the law because of her views on the death penalty, and an ability to follow her oath and the law as instructed by the court, great deference should be given to the decision of the trial judge. A trial court's ruling on these issues should be reversed "only when the record shows a clear abuse of discretion."

799 S.W.2d at 731, quoting *Davis v. State*, 782 S.W.2d 211, 216 (Tex.Cr.App.1989); see also *Perillo v. State*, 758 S.W.2d 567, 576–77 (Tex.Cr.App.1988) (venireperson who repeatedly equivocated was properly excluded for cause); *Ransom v. State*, 789 S.W.2d 572, 582–83 (Tex.Cr.App.1989).

In the case at bar, the testimony of prospective jurors Fehrenbacher and Gauthier demonstrates considerable uncertainty as to whether the jurors' feelings about capital punishment would render them incapable of adhering to their oath and applying the law as given to them by the trial judge.

In the case of Fehrenbacher, she expressed at the beginning of her voir dire examination that participating in a verdict that could result in the death penalty was something she could never do. See Appendix. At the conclusion of her voir dire she agreed that her misgivings about capital punishment would weigh so heavily on her mind that the possibility of her assessing the death penalty was so remote as to be nonexistent. Id. The remainder of her

responses underscore her uncertainty about being able to participate impartially in a jury that might be called upon to impose capital punishment. *Id.* In sum, she was the quintessential "equivocating" juror and, as such, we defer to the trial judge who was able to observe her demeanor and assess her capacity to serve. Obviously, her equivocating answers, coupled with her demeanor on the witness stand, convinced the trial judge that she would be substantially impaired.

By contrast, venireperson Gauthier may be characterized as the paradigmatic "vacillating" juror. When questioned by the State, he unambiguously revealed his inability to participate in a jury subject to imposing capital punishment. See Appendix. He stated that he would answer "no" to one of the special issues in order to prevent a person from receiving death, regardless of what the facts adduced at trial were. Id. When examined by defense counsel, the venireperson reneged, suggesting he could answer the special issues according to his oath, if required by the evidence. Id. Subsequent questioning by both State and defense counsel compounded this vacillation. Id.

■ As stated above, when the trial judge is faced with a vacillating juror, the decision to sustain a challenge for cause must be given great deference on appeal. Such a ruling will not be disturbed unless there is no adequate basis in the record to support the ruling. In the case at bar, Gauthier consistently wavered between polar extremes—one moment seemingly able to abide by the oath, the next apparently willing to violate his oath and the instructions of the trial judge in order to escape participation in a death sentence. Faced with such inconsistencies, we again defer to the trial judge who was able to perceive firsthand the testimony and countenance of the prospective juror.

Having found adequate bases for the rulings of the trial judge in excluding prospective jurors Fehrenbacher and Gauthier, we find no clear abuse of discretion. Appellant's eleventh and twelfth points of error are overruled.

The judgment of the trial court is AFFIRMED.

WHITE, J., not participating.

### APPENDIX

Excerpts of Patricia Fehrenbacher's Voir Dire Testimony

Q. [BY THE STATE]: Okay. Let me ask you: Is that—Is participating in a verdict that could result in a death penalty, is that something that you could just never do?

A. I feel, yes, that I could never do it.

\* \* \*

Q. I get the feeling, from what you're telling me, and what you have written here, that your feeling, regardless of the crime. The death penalty is just something that you can't participate in?

A. I feel right now, the way—I know nothing about the case, etc., hopefully, I don't know much about it, but, whatever the case would be, I would prefer some sort of educational process with someone.

\* \* \*

Q. So, is it safe to say that given those options of death or life, regardless of the facts of this case, and regardless of the evidence, you are going to always opt for life?

A. Yes.

\* \* \*

Q. [BY DEFENSE COUNSEL]: Am I understanding you to say that there is no way you would ever assess the death penalty, or that you don't think you would because it's a very uncomfortable position that you would be in?

A. That's true. I don't think I could. I would feel very uncomfortable.

\* \* \*

Q. And so, when you get ready to answer those questions ... you will have been given either sufficient information or insufficient information to answer those questions "Yes" or "No".

A. Yes. I understand that. I, also, understand my whole upbringing and my

whole life has always been religiously centered on life, which I presume is preferable over death.

Q. Well, part of our Catholic upbringing is, also, that we are to follow the laws of our country, and of our state, and of our city, and things of that nature, isn't it?

A. Yes, sir.

Q. ... All I'm asking you is, if the evidence is proven, is there not a case that you would think of that you could, possibly, consider answering those questions "Yes"?

A. There possibly is a case, and it is a possibility, however, I still feel uncomfortable with this.

Q. I understand, but you would not necessarily just vote "No"; there is a possibility you could vote "Yes"? Is that right?

A. I doubt very much that I could vote "Yes" if I felt there was going to be a death penalty.

Q. But you could, if you had to?

A. I can't say that I would, right now.

Q. We can't ask you to say that you would. All we can do is ask you, if the evidence is proven, you won't automatically exclude it from your mind, and automatically vote "No". That you could consider "Yes", and there is a possibility, in a certain case, that you could answer those questions "Yes".

A. With the death penalty in back of my mind, I do not realize, nor do I recognize, that I would vote, positively, "Yes", that I would want death involved. And I would feel very, very guilty, personally, if I were involved in a case where I did that. My conscience would bother me; I would prefer definitely living with myself with a clear conscience.

Q. Yes, ma'am.

A. I don't know if I have explained myself to you, but I'm sorry. Even though it was proven to me, I would hope that I would, but I cannot assure you, right now, that I would. Death is appalling to me.

Q. I understand, but there is a possibility, is there not?

A. Sir, I can't answer that. I have not heard the evidence, and I cannot give you—

Q. I understand that. We're just saying there is—

A. And I am repeating, again, I do not know. My life is one of education, and trying to uphold the laws of this State, definitely, but I, also, am very uncomfortable with the thought of being in a position such as that.

\* \* \*

Q. But if the evidence proved that you should vote "Yes", you could vote "Yes"? Is that right?

A. Sir, I think we have gone round and round and round, and I still must insist that is if I felt death was involved, I would have to say, "I don't know what my vote would be," and I can give you no other answer than that.

Q. [BY THE STATE]: Your Honor, I think clearly ... this juror has explained, as well as can be explained, how the death penalty is going to weigh heavily on her mind, and in the event that—the possibility of her assessing the death penalty is so remote as to be nonexistent. Would that be true, Mrs. Fehrenbacher?

A. I believe so, yes.

\* \* \* \* \* \*

Excerpts of Harold Gauthier's Voir Dire Testimony

Q. [BY THE STATE]: So, just let me start off with my first question: How strong do you feel about this, that you don't believe in the death penalty and you couldn't be on the jury?

A. Well, basically, the reason I said it is because I am a Minister, and if I could recall—quote the Scriptures, "No man have a right to take another man's life." That's what I believe, personally.

\* \* \*

Q. And I'll ask you the question: Is there any situation where you believe that you could be a part of a jury that assessed a death penalty, any fact situation.

A. I don't think so.

\* \* \*

Q. That's important because even in a fact situation that's horrible . . . if you feel so strong that you couldn't participate in it, and you couldn't answer "Yes" to those questions, then you're not qualified as a juror, and that would be it. Is that what you're telling the Court, that's how strong you feel?

A. Yes, sir.

Q. Would you grab that piece of paper in front of you? Those are the three questions which you may or may not see in any capital murder case, if you were to be on the jury. . . . Are you telling me that regardless of what the facts are, that if you were on the jury, that you would say "No" to one of those questions because you know that would keep the person from getting the death penalty? I think that's what you're saying.

A. Yes, that's what I'm saying.

\* \* \*

Q. Are you saying you have conscientious scruples against the death penalty?

A. Yes.

Q. And you have a bias or prejudice against the law in Texas, as far as the death penalty, because you don't believe in it? Is that right?

A. Right.

\* \* \*

Q. [BY DEFENSE COUNSEL]: So, what your duty, then, would be is whether you can consider the answer of "Yes" to those questions, and not that you have to give the death sentence if you are selected for the jury, and if you found somebody guilty. Do you understand the distinction?

A. Yes.

Q. And understanding that distinction, have you changed your position now? Could you weigh the evidence and, in a proper case, if the evidence showed to you, beyond a reasonable doubt, that the answers should be "Yes" to those questions, could you answer them "Yes"?

A. I don't—not for a death penalty, no.

Q. Okay. But do you understand that you don't have to find him guilty?

A. No.

Q. In fact, there's a whole range of lesser-included offenses that might come into play. Do you understand that?

A. Yes.

Q. So, by taking the position, or being selected as a juror, does not mean that you will necessarily get faced with that problem.

A. Okay.

Q. So, once again, we're back to that. With that one question in mind, if you are put on the jury, and all twelve of you have decided that this person or any person is guilty of Capital Murder, could you consider the evidence and, possibly, answer "Yes" to those questions?

A. Yes, I could.

Q. You could?

Q. You could do it? Is that correct?

A. Yes.

Q. So, in a proper case, you could answer those questions "Yes"?

A. Yes.

\* \* \*

Q. [BY THE STATE]: If it was a guy that, just say, killed two people, or a guy that killed fifty people in your church, would you still say that you would take the life and you would never give the death penalty?

A. Right.

Q. So, you would say "No" to one of those questions, then? Is that what you're saying?

A. Yes.

Q. Automatically, you would say "No" and you would say "No" in every single fact situation?

A. Yes.

Q. So, you couldn't be fair to the State, because the death penalty is not a valid alternative or option in your mind? Is that correct?

A. Yes.

Q. Because you would always opt for life?

A. Right.

\* \* \*

Q. [BY DEFENSE COUNSEL]: Mr. Gauthier, now, I'm a little confused. Didn't you say earlier that you could ... fulfill your duty and you could listen to the evidence, and if the evidence dictated it to you, you could answer "Yes" or "No", depending on what the evidence dictated, and you would be governed by the evidence, and not necessarily on your absolute disbelief in the death penalty?

A. Are you saying the evidence would govern my decision?

Q. Yes.

A. Whether it's life or the death penalty, right?

Q. That's right.

A. Okay. I wouldn't necessarily, you know, say that I would vote for the death penalty.

\* \* \*

Q. I'm asking you, if you're selected to be on the jury, would you do your duty, on the second part? And if you found him guilty on the first part of the trial, would you do your duty to listen to the evidence and vote according to what the evidence shows you to vote, and not necessarily vote "No" because you just don't believe in it? Can you do your duty and vote "Yes" if the evidence proves to you, beyond a reasonable doubt, that the answers to those questions should be "Yes"?

A. If the evidence proves to me that, beyond a reasonable doubt, that it should be "Yes"?

Q. Can you vote "Yes"?

A. Yes.

Q. [BY THE COURT]: The question—I need to add one little phrase to it. Could you vote "Yes", knowing that it would result in the death penalty being imposed?

A. No.

\* \* \*

Q. [BY DEFENSE COUNSEL]: Can you do your duty and weigh the evidence? You don't have to vote "Yes", but, I'm saying, if the evidence proves to you, beyond a reasonable doubt, can you answer those questions—

A. Yes.

Q. —"Yes", knowing that the death penalty is going to be imposed?

A. I could. I—

Q. Okay. Thank you.

\* \* \*

Q. [BY THE STATE]: I guess what we're asking you is, if you came to that, you know, deciding on the one hand your personal beliefs, as they may come into conflict with what you felt your duty might be, do you feel you would go with your personal religious beliefs, you feel like those would be stronger?

A. Yes.

Q. How strong do you feel about that? Do you feel so strong that you would say, under every circumstance, when they ask those questions, that you would write down "No", even if eleven other jurors in there were saying, "Yes", "Yes", "Yes". "We think the evidence has proved it." Would you still say "No" because you know if you said "No", you would save that person's life? Is that how strong you feel about it?

A. That's my personal belief.

Q. As a result of having those strong personal beliefs, do you feel that you have a conscientious scruple against the death penalty, and, therefore, could not be a fair juror?

A. I don't approve of the death penalty, no.

\* \* \*

Q. It would be fair to say you are biased or prejudiced against the death penalty; isn't that fair? And that, ultimately, when it came down to making the decision, that when you had to look, inside your heart, you would be guided by those strong per-

sonal religious beliefs, and say "No"? Is that what you're telling us.?

A. Right.

\* \* \*

Q. [BY DEFENSE COUNSEL]: Mr. Gauthier, I, once again,—I think we're all— And like you say, we're asking the same question, different ways, and you're agreeing with both of us. If you are on this juror—or on this jury, as a juror, and these questions are presented to you, and you achieve the point, or you've gotten to the point where you must vote on these issues, Mr. Middleton asked you whether or [sic] personal feelings would govern your ultimate decision, and, then, when I asked you, you're saying your ultimate decision would be—your final decision, would be governed by the evidence, and that evidence shows you that it should be "Yes", then, you're telling me that you would vote "Yes". Is that correct?

A. What I was saying is that I could, but I didn't really say I would.

Q. No. Neither one of us can ask you to commit yourself. All we can ask you is whether you can consider it, and if the evidence proves to you, beyond a reasonable doubt, then you can answer the questions, "Yes"? Is that right?

A. Yes.

\* \* \*

Q. [BY THE STATE]: Your Honor ... [the venireperson] told Mr. DeLee very plainly, on the last part of the question that, sure, he could consider it, but he could never do it, and, ultimately, that is the question. When it came down to rendering any decision, he could not render it. I think that's what this juror says—

Q. [BY THE COURT]: Is that what you're saying?

A. [BY THE VENIREPERSON]: Yes, sir.