Becker v. State











COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS




MARCOS MARTINEZ,


 Appellant,


v.



THE STATE OF TEXAS,


 Appellee.


§


 


§


 


§


 


§


 


§


 


 § 

No. 08-01-00501-CR



Appeal from the


112th District Court


of Crockett County, Texas


(TC# 2097)





M E M O R A N D U M O P I N I O N


 Marcos Martinez appeals his conviction for possession with intent to deliver more
than 200 grams but less than 400 grams of heroin. A jury found Appellant guilty and
assessed punishment at a fine of $20,000 and imprisonment for a term of twenty (20) years. 
We affirm.

FACTUAL SUMMARY


 Officer DuWayne Castro, a certified peace officer, is employed by the Rio Concho
Drug Task Force. On October 25, 2000, Castro stopped a 2000 Toyota Camry for speeding
on Interstate 10 in Crockett County. The vehicle was traveling 89 miles per hour in a 70
miles per hour zone. Castro first contacted the driver, Ovidio Martinez, and then the two
passengers, Rolando Garcia and Appellant. Castro spoke to them in Spanish because none
of them understood English. Castro obtained driver's licenses from all three men and the
rental agreement for the car. All three driver's licenses showed Miami, Florida addresses. 
The rental agreement showed that Ovidio had rented the car. Castro knew that a large
amount of contraband is distributed from Miami throughout the United States and that
Interstate 10 is utilized by drug traffickers. He also knew that rental cars are commonly used
for drug trafficking because rental cars, unlike personal cars, cannot be seized. Castro asked
Ovidio, who had exited the vehicle, where they were going. He replied that they were going
to Albuquerque, New Mexico to paint the exterior of a Motel 6. Castro walked back to the
car and asked the same question of the two passengers. They also told him they were going
to Albuquerque to paint. They did not have any painting equipment in the Camry. Ovidio
explained that the equipment had already been sent to Albuquerque by "the company." Later
in the conversation, he said that ENA was his company and they had been painting the motel
for two months. He did not have a business card and did not know the address of the motel. 
 Castro then returned to his patrol unit to run a driver's license check through the
Department of Public Safety to ensure that their licenses were valid and they were not wanted
in any other jurisdiction. Castro waited several minutes for the returns on the license checks. 
Castro noted that it commonly takes longer to obtain a return on Florida inquiries. Officer
Nick Richter, who is also employed by the Rio Concho Drug Task Force, arrived at the scene
and waited with Castro in his patrol car. Richter, who was watching Ovidio as he stood in
front of the patrol car, noticed a large bulge in his pants pocket. Castro exited the patrol car
to speak with Ovidio. Richter does not speak Spanish so he remained in the patrol car to
complete the license check and to also run a "pipeline" check through El Paso Intelligence
(EPIC) to determine whether there were any ongoing investigations involving the men. (1) 

 Castro asked Ovidio for consent to search the car and he voluntarily consented. 
Before searching Ovidio's person, Castro asked him whether he had any weapons. At first,
Ovidio said that he did not have any weapons but then admitted that he had two knives when
Castro told him that he was going to do a pat-down search for weapons. Castro felt the
outside of Ovidio's pockets and determined that he had a large wad of money in his pocket. 
Castro asked him how much he had. Ovidio first told Castro that he did not know how much
he had, but subsequently said he had $10,000. He then said that Castro could count it if he
wanted. Castro counted the money and confirmed that it was $10,000. Ovidio told Castro
that the money in his pocket was not for Garcia and Appellant but to pay the laborers who
had been painting the motel. He paid the men in cash rather than by check because "they live
in Florida". Castro informed Ovidio they were going to search the car and Ovidio responded
that he did not have a problem with them searching the car. 

 Castro then informed the passenger seated in the front seat, Garcia, that they were
going to search the car and asked him to exit it. He also had bulges in his pockets and Castro
determined during a consensual pat-down search that Garcia also had a large sum of money. 
Garcia told him that he had $6,000 or perhaps $7,500. (2) Castro noticed that Garcia had money
stashed in several pockets. Garcia told Castro that he worked for Ovidio's company, which
he called "ENS". Castro questioned him about the source of the money and what he was
going to do with it. Garcia insisted that the money belonged to him and his wife, but he did
not have any bank receipts for the money. He was going to buy a boat in New Mexico when
they were through with the job because boats are cheaper in New Mexico than in Florida. 
He explained that he was going to buy a boat trailer and rent a truck to drive back to Florida. 
 When Castro informed Ovidio they were about to start searching the car, he
volunteered that he had more money in his left pocket. Castro verified that Ovidio had
almost $1,500 in his left pocket. (3) At this point, Castro informed Appellant, who was still
seated in the backseat, that Ovidio had consented to a search of the car. He asked Appellant
whether there was anything illegal in the car and he replied "Not that I know of". Castro
asked whether he had any weapons or a wallet in his pockets, and Appellant told him that he
only had money. Appellant exited the car and Castro verified that he also had a large sum
of money in his pocket. Appellant told Castro that he had $4,500. (4) Appellant, who had been
within earshot of the earlier conversation between Castro and Garcia, claimed that the money
was his and he and Garcia planned to buy a boat when they were through with the job. They
would take it back to Miami and sell it, or perhaps use it. He did not know what type of boat
they planned to buy. Castro returned to speak with Ovidio about the money. He knew the
other two men had large sums of cash but claimed that all of it belonged to his company and
he was going to use it to buy the paint and pay the laborers. Ovidio later told Castro that the
money in Garcia's possession was Ovidio's separate property, and did not belong to the
company, and he was going to use it to pay for living expenses while they were in
Albuquerque. He did not know how long they would be in New Mexico. Ovidio told Castro
that he had not been in Texas for quite some time, but then said he had been in El Paso,
Texas approximately one and a half months ago. He was married but separated from a
woman who lived in El Paso or perhaps Las Cruces. He also had a son. 

 The driver's license checks did not reveal any warrants but Castro and Richter learned
through the EPIC check that the three men had been the subject of surveillance in South
Texas only a month and a half earlier. (5) Castro and Richter searched the car but did not
immediately find any controlled substances. Based upon all of the circumstances, including
the large sums of cash carried by the men and their conflicting stories about the money,
Castro and Richter suspected that the three men were involved in a money laundering
operation. Consequently, they decided to seize the money for forfeiture. In accordance with
procedure for handling seized money, they went to the Sheriff's Office in Ozona so they
could get an accurate count and give the men receipts for the money. Ovidio, Garcia, and
Appellant voluntarily agreed to accompany the officers to Ozona and give statements
regarding the sources of their money. After they counted the money and issued receipts,
Castro took written statements from Appellant and Garcia but Ovidio decided against giving
a statement. Based upon Ovidio's consent to search, Castro then conducted a canine search
of the exterior of the vehicle. The dog first alerted on the exterior of the vehicle, then he
alerted inside of the vehicle, both in the backseat and front seat. However, he alerted most
aggressively in the front seat of the vehicle. Richter opened the hood and found an oblong-shaped object wrapped tightly in black electrical tape hidden in the car's air filter. Richter
could smell the distinct odor of heroin even before they punctured the package. Ovidio,
Garcia, and Appellant were immediately arrested for possession of heroin. A field-test
confirmed that the substance contained within the package was heroin. Laboratory testing
verified the field test and further established that the package contained 301.43 grams of 8
percent heroin, or approximately 3000 individual doses. Richter estimated that a dealer
would purchase this quantity of heroin for approximately $20,000 to $30,000 but its street
value was approximately $60,000. In other words, a dealer would double his investment.


 On the day following the arrests of the three men, Ovidio's wife, Denora Martinez,
appeared at the Crockett County Sheriff's Office and advised them that she needed to retrieve
a child's car seat from the rental car. The car seat was inspected and found to have $28,000
in cash hidden in it. They also found Ovidio's "drug ledger". The ledger had names and
amounts written next to them. Ovidio and Garcia disappeared after making bond. Appellant
was unable to make bond.

 Appellant testified in his own behalf at trial. He and Ovidio Martinez are half-brothers. Appellant was born in Cuba and lived there until he was 24 years' old. He left
Cuba in 1994. He lived near Ovidio in Miami and began working for him as a painter. 
Ovidio owned a painting company and employed about five people. Ovidio was married to
Denora Martinez, who lived in Texas, and they had a seven-year-old son. Garcia also
worked for Ovidio but Appellant had known Garcia in Cuba. Appellant stopped working for
Ovidio in 1997 and began working for a sheet metal subcontractor. He moved from Miami
to Lake City, Florida. At the time of his arrest, he was living in a mobile home. A few days
prior to October 25, 2000, Ovidio called Appellant and told him that he and Garcia had just
returned from Cuba. Ovidio needed his help on a painting job in Albuquerque, New Mexico. 
Appellant was not working at the time so he agreed to help after negotiating how much
Ovidio would pay him. On cross-examination, however, Appellant could not state the terms
of the agreement he had reached with Ovidio. Appellant initially was going to take only
$1,000 on the trip but Ovidio told him to take more money because he could buy an antique
car or a boat in Albuquerque. Consequently, Appellant carried $4,000 of his own money
with him on the trip. He had earned the money by working. According to Appellant, the
officers were incorrect in stating that he had only $3,200 in his possession at the time of the
arrest. (6) Ovidio was driving and talking on the cell phone to his wife, Denora Martinez, when
Castro stopped their car. He did not know that there was any heroin in the car. The jury
rejected Appellant's defense and found him guilty of possession with intent to deliver as
charged in the indictment. 

LEGAL SUFFICIENCY


 In Point of Error Number One, Appellant contends that the evidence is legally and
factually insufficient to support his conviction because it does not affirmatively link him to
the heroin found hidden in the car.

Standards of Review


 In reviewing the legal sufficiency of the evidence to support a criminal conviction, we
must review all the evidence, both State and defense, in the light most favorable to the
verdict. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560,
573 (1979); Geesa v. State, 820 S.W.2d 154, 159 (Tex. Crim. App. 1991). The critical
inquiry is whether, after so viewing the evidence, any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt. McDuff v. State, 939 S.W.2d
607, 614 (Tex. Crim. App. 1997). This familiar standard gives full play to the responsibility
of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to
draw reasonable inferences from basic to ultimate facts. Jackson, 443 U.S. at 319, 99 S.Ct.
at 2789, 61 L.Ed.2d at 573. Our duty is not to reweigh the evidence from reading a cold
record but to act as a due process safeguard ensuring only the rationality of the fact finder. 
Williams v. State, 937 S.W.2d 479, 483 (Tex. Crim. App. 1996). The verdict may not be
overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. Matson
v. State, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The standard of review is the same
for both direct and circumstantial evidence cases. Geesa, 820 S.W.2d at 158.

 When conducting a factual sufficiency review, we consider all of the evidence, both
admissible and inadmissible, but we do not view it in the light most favorable to the verdict. 
Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Levario v. State, 964 S.W.2d
290, 295 (Tex. App.--El Paso 1997, no pet.). We review the evidence weighed by the jury
that tends to prove the existence of the elemental fact in dispute and compare it with the
evidence that tends to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App.
2000); Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). A defendant
challenging the factual sufficiency of the evidence may allege that the evidence is so weak
as to be clearly wrong and manifestly unjust, or in a case where the defendant has offered
contrary evidence, he may argue that the finding of guilt is against the great weight and
preponderance of the evidence. See Johnson, 23 S.W.3d at 11. Although we are authorized
to set aside the fact finder's determination under either of these two circumstances, our
review must employ appropriate deference and should not intrude upon the fact finder's role
as the sole judge of the weight and credibility given to any evidence presented at trial. See
Johnson, 23 S.W.3d at 7. We are not free to reweigh the evidence and set aside a verdict
merely because we feel that a different result is more reasonable. Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997); Clewis, 922 S.W.2d at 135.

Affirmative Links Analysis 


 A person commits the offense of possession of heroin with intent to deliver if he
knowingly or intentionally possesses the controlled substance. See Tex. Health & Safety
Code Ann. § 481.112(a) (Vernon 2003). The Penal Code defines possession as "actual care,
custody, control, or management." Tex. Health & Safety Code Ann. § 481.002(38)
(Vernon Supp. 2004). To support a conviction for unlawful possession of a controlled
substance, the State must prove that the accused (1) exercised actual care, custody, control,
and management over the contraband, and (2) the accused knew the substance he possessed
was contraband. See Brown v. State, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995);
Menchaca v. State, 901 S.W.2d 640, 651 (Tex. App.--El Paso 1995, pet. ref'd). By either
direct or circumstantial evidence, the State must establish, to the requisite level of
confidence, that the accused's connection with the drug was more than just fortuitous. 
Brown, 911 S.W.2d at 747.

 When the defendant is not in exclusive possession or control of the place where the
contraband is found, as in this case, the State must prove independent facts and
circumstances affirmatively linking him to the contraband. Hackleman v. State, 919 S.W.2d
440, 444 (Tex. App.--Austin 1996, pet. ref'd, untimely filed). An affirmative link generates
a reasonable inference that the accused knew of the contraband's existence and exercised
control over it. See Brown, 911 S.W.2d at 747; Menchaca, 901 S.W.2d at 651. These
affirmative links may include: (1) the accused's presence when the search was executed; (2)
the contraband was in plain view; (3) the contraband is in close proximity to and accessible
by the accused; (4) the accused was under the influence of a controlled substance when
arrested; (5) the accused was in possession of other contraband when arrested; (6) the
accused made incriminating statements when arrested; (7) the accused attempted to flee; (8)
the accused made furtive gestures; (9) there was an odor of the contraband; (10) other
contraband or drug paraphernalia was present; (11) the accused owned or had the right to
possess the place where the contraband was found; (12) the place the drugs were found was
enclosed; (13) the amount of contraband; and (14) possession of weapons. Hackleman, 919
S.W.2d at 444.

Review of the Evidence


 Appellant argues that only the third and fourteenth factors are present in this case. 
However, the number of factors present is less important than the logical force the factors
have in establishing the elements of the offense. Hurtado v. State, 881 S.W.2d 738, 743
(Tex. App.--Houston [1st Dist.] 1994, pet. ref'd). Furthermore, the list of affirmative links
is not exhaustive. Appellant's driver's license had a Miami address although he claimed to
live in another Florida city. Miami is a source city for narcotics. The jury could have
disbelieved Appellant's explanation that they were traveling in a rental car from Miami,
Florida to Albuquerque, New Mexico to paint a Motel 6 particularly since none of the men,
including Ovidio Martinez, knew the address for the motel and they had no painting supplies
or painter's clothing with them in the car. Ovidio's claim that he operates his painting
company as a cash-based business is also subject to skepticism. Including the money found
hidden in the baby seat, more than $50,000 was found in the car and in the possession of
Appellant, Ovidio, and Garcia. A drug ledger was also found in the car. The three men gave
conflicting stories regarding the source of the money found in their pockets and what they
intended to do with it. After overhearing Garcia's conversation with Castro, Appellant
claimed to have earned the money through other employment and had brought it with him
to purchase a boat. Appellant did not know what type of boat he and Garcia intended to buy
or how much it would cost. Ovidio, on the other hand, claimed that the money in Appellant's
possession belonged to his painting company and Appellant was merely holding it for him. 
Thus, Ovidio linked the money in Appellant's possession to the large amount of money in
the car. The evidence supports an inference that the large sum of money found in the
possession of these three men and in the car was the proceeds from illegal narcotics activity. 
The money, in turn, links Appellant to possession of the heroin. The jury could have
reasonably concluded that Appellant had knowledge of the heroin and exercised care,
custody, and control of it. Having reviewed the evidence under the proper standards of
review, we conclude that the evidence is both legally and factually sufficient to support
Appellant's conviction. Point of Error Number One is overruled.

MOTION TO SUPPRESS


 In Point of Error Number Two, Appellant argues that the trial court erred by denying
his motion to suppress because the continued detention after the purpose of the stop had been
completed was unreasonable and not supported by reasonable suspicion. He contends that,
at the very least, he should have been released after the roadside search yielded no
contraband.

Standard of Review


 We review the trial court's ruling using the bifurcated standard articulated in Guzman
v. State, 955 S.W.2d 85 (Tex. Crim. App. 1997). See Carmouche v. State, 10 S.W.3d 323,
327 (Tex. Crim. App. 2000); Krug v. State, 86 S.W.3d 764, 765 (Tex. App.--El Paso 2002,
pet. ref'd). Under this standard, we afford almost total deference to the trial court's express
or implied determination of historical facts and review de novo the court's application of the
law to those facts. State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); Carmouche,
10 S.W.3d at 327; Krug, 86 S.W.3d at 765. As there were no explicit findings of historical
facts by the trial court, the evidence must be viewed in a light most favorable to the trial
court's ruling. Carmouche, 10 S.W.3d at 327.



Investigative Detention


 A routine traffic stop resembles an investigative detention. Berkemer v. McCarty, 468
U.S. 420, 439, 104 S.Ct. 3138, 3149-50, 82 L.Ed.2d 317 (1984); State v. Cardenas, 36
S.W.3d 243, 246 (Tex. App.--Houston [1st Dist.] 2001, pet. ref'd). To determine the
reasonableness of an investigative detention, we apply the test articulated in Terry v. Ohio:
(1) whether the officer's action was justified at its inception; and (2) whether it was
reasonably related in scope to the circumstances that justified the initial interference. Terry
v. Ohio, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); Davis v. State, 947
S.W.2d 240, 244 (Tex. Crim. App. 1997). The United States Supreme Court has held that,
as a general matter, the decision to stop an automobile is reasonable where the police have
probable cause to believe that a traffic violation has occurred. Whren v. United States, 517
U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Under Texas law, a peace
officer is authorized to arrest a driver found committing a traffic violation other than
speeding. See Tex. Code Crim. Proc. Ann. art. 14.01(b) (Vernon 1977) (a peace officer
may arrest an offender without a warrant for any offense committed in his presence or within
his view); Tex. Transp. Code Ann. § 543.001 (Vernon 1999) (general authorization to
arrest); Tex. Transp. Code Ann. § 543.004 (Vernon 1999) (exception for speeding offense). 
Therefore, traffic violations committed in an officer's presence provide probable cause to
stop the vehicle and detain the driver. McVickers v. State, 874 S.W.2d 662, 664 (Tex. Crim.
App. 1993); Hargrove v. State, 40 S.W.3d 556, 559 (Tex. App.--Houston [14th Dist.] 2001,
pet. ref'd) (traffic violation, i.e., failure to signal lane change, committed in officer's
presence provides probable cause and justifies detention); see also Whren, 517 U.S. at 810,
116 S.Ct. at 1772. 

 A search that is reasonable at its inception may violate the Fourth Amendment by
virtue of its excessive intensity and scope. See Davis v. State, 947 S.W.2d 240, 243 (Tex.
Crim. App. 1997). Under the second Terry guideline, an investigative detention must be
temporary and last no longer than is necessary to effectuate the purpose of the stop. See
Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); Davis,
947 S.W.2d at 243. The propriety of the stop's duration is judged by assessing whether the
police diligently pursued a means of investigation that was likely to dispel or confirm their
suspicions quickly. Davis, 947 S.W.2d at 245. Once the reason for the stop has been
satisfied, the stop may not be used as a fishing expedition for unrelated criminal activity. See
Ohio v. Robinette, 519 U.S. 33, 41, 117 S.Ct. 417, 422, 136 L.Ed.2d 347 (1996) (Ginsburg,
J., concurring); Davis, 947 S.W.2d at 243. In analyzing the reasonableness of the detention,
we keep in mind that during a routine traffic stop, an officer has the right to check for
outstanding warrants and request: (1) a driver's license; (2) insurance papers; and (3)
identification. See Davis, 947 S.W.2d at 245. The officer may also question the driver about
ownership of the vehicle, the driver's destination, and the purpose of the trip. See Powell v.
State, 5 S.W.3d 369, 377 (Tex. App.--Texarkana 1999, pet. ref'd). It is also reasonable for
the officer to ask similar questions of the passengers. See Duff v. State, 546 S.W.2d 283, 286
(Tex. Crim. App. 1977). If during the course of a valid traffic stop the officer develops a
reasonable suspicion that criminal activity is occurring, a continued detention is justified. 
Zervos v. State, 15 S.W.3d 146, 151 (Tex. App.--Texarkana 2000, pet. ref'd). An officer may
rely on all of the facts ascertained during the course of his contact with a defendant to
develop articulable facts that would justify a continued detention. Sims v. State, 98 S.W.3d
292, 295 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd); Powell, 5 S.W.3d at 377.

 Once a valid traffic stop is made, officers at the scene are entitled to take sufficient
measures to guarantee their safety. Goodwin v. State, 799 S.W.2d 719, 727 (Tex. Crim. App.
1990); see Terry, 392 U.S. at 23, 88 S.Ct. at 1881 (noting that it would be unreasonable to
require that police officers take unnecessary risks in the performance of their duties). Police
officers may order persons out of an automobile during a stop for a traffic violation, and they
may frisk those persons for weapons if there is a reasonable belief they are armed and
dangerous. Michigan v. Long, 463 U.S. 1032, 1048-49, 103 S.Ct. 3469, 3480-81, 77 L.Ed.2d
1201 (1983); Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331
(1977); Goodwin, 799 S.W.2d at 727.

 Appellant alleges in his brief that "the evidence clearly indicates that no traffic
violation occurred." To the contrary, Castro testified that he stopped the Camry because it
was traveling 89 miles per hour in a 70 mile per hour zone. Castro's failure to issue a traffic
citation to Ovidio Martinez is not proof that the traffic violation did not occur. The evidence
supports the trial court's implied finding that the officer had probable cause to believe Ovidio
Martinez had committed a traffic violation.

 Appellant next argues that he should have been released approximately eight minutes
after the initial stop because the purpose of the stop had been accomplished. He contends
that the continued detention was unreasonable and not supported by reasonable suspicion. 
As part of the traffic stop, Castro asked for identification of the driver and the car's
occupants and he ran a warrant check which took several minutes. During that time, Castro
and Richter obtained information and made observations which made them suspicious that
the men were transporting narcotics or engaging in money laundering. From the driver's
licenses and car rental information, Castro learned that the men were from Miami, Florida,
a source city for illegal drugs, and they were driving a rental car which is commonly used to
transport narcotics. While waiting for the returns on the license checks, Castro and Richter
noticed a suspicious bulge in Ovidio's pocket and learned that he had $10,000 in cash in one
pocket and more in the other. This further increased the officer's suspicions that the men
were involved in illegal drug activity. Consequently, Castro asked for and obtained Ovidio's
permission to search the car. Before searching the car and while still waiting for the returns,
the officers continued their investigation by talking to the men about their destination and the
purpose of the trip. Ovidio's explanation that they were traveling to Albuquerque to paint
a Motel 6 was questionable given that he did not have an address for the motel and there
were no painting supplies or painter's clothing in the car. The officers' suspicions increased
when they discovered that both of the passengers also possessed large amounts of cash and
the men gave inconsistent explanations for their possession of the cash. They searched the
vehicle and initially found no contraband but determined that they would seize the cash as
contraband under Article 59 of the Code of Criminal Procedure. (7) The road side detention
lasted almost two hours from the initial traffic stop to the conclusion of the consensual
search. Ovidio, Garcia, and Appellant then voluntarily accompanied the officers to the
Sheriff's Office to give statements about the money and to obtain receipts for it. After these
tasks were completed, the officers' conducted an additional search of the car's exterior with
a dog. When the dog alerted, they continued the search inside of the car and soon discovered
the heroin hidden in the air filter. 

 We conclude that the initial detention was lawful and reasonably related in scope to
the circumstances that justified the initial interference. Thereafter, the continued road-side
detention was based on developing information which provided the officers with reasonable
suspicion to believe the men were engaged in illegal activity and probable cause (8) to believe
that the money was the proceeds of illegal activity. After the road-side detention concluded
and the officers developed reason to believe that the money was contraband and subject to
seizure, Appellant and the other men voluntarily accompanied the officers to obtain receipts
for the money and to give written statements about the source of the money in their
possession. The trial court did not abuse its discretion by denying the motion to suppress. 
Point of Error Number Two is overruled. Having overruled both points of error, we affirm
the judgment of the trial court. 

July 15, 2004


 

 ______________________________________ 
 STEPHEN F. PRESLAR, Chief Justice (Ret.)




Before Panel No. 5

Preslar, C.J. (Ret.), McClure, and Chew, J.J.

Preslar, C.J. (Ret.) sitting by assignment



(Do Not Publish)
1. Information pertaining to ongoing investigations is submitted to and stored in the EPIC database from
various Federal, State, and local law enforcement agencies. Federal agencies include the FBI, DEA, Border Patrol,
Customs, INS, and IRS. 
2. When the officers counted the money later, they determined that Garcia had $7,960 on his person. 
3. Ovidio had a total of $11,466 on his person. 
4. Appellant had $3,200 in his possession. 
5. This jury did not hear this evidence regarding the results of the EPIC check as it was presented only
during the motion to suppress hearing.
6. The prosecutor impeached Appellant with a prior inconsistent statement. He had testified during a prior
hearing that he had $3,200 with him on the trip and it represented his life savings. 
7. See Tex. Code Crim. Proc. Ann. Art. 59.01-59.14 (Vernon Pamph. 2004).
8. In forfeiture cases, the State is required to show probable cause for seizing property, that is, a reasonable
belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by the
statute. $56,700 in U.S. Currency v. State, 730 S.W.2d 659, 661 (Tex. 1987); Forty-Seven Thousand Two Hundred
Dollars U.S. Currency ($47,200) v. State, 883 S.W.2d 302, 306 (Tex. App.--El Paso 1994, writ denied); Tex.
Const. art. 1, § 9.